No. 64,007

IN THE MATTER OF THE ESTATE OF CARL EDWARD RANEY,
Deceased.

(799 P.2d 986)

Opinion filed October 26, 1990.

*Gene H. Sharp*, of Neubauer, Sharp, McQueen, Dreiling & Morain, P.A., of Liberal, argued the cause and was on the brief for appellants.

*Arthur B. McKinley*, of Sublette, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal from the trial court's judgment finding that the decedent, Carl Edward Raney, lacked testamentary capacity at the time of the execution of his will because of an insane delusion. The appellants, who are decedent's sisters and the beneficiaries of the will, also appeal the trial court's denial of a new trial. The appellees are Virginia Cauthorn, Carl A.

Raney, and Wayne L. Raney, children and only heirs of the decedent.

The facts are extensive and, because the appellants challenge the sufficiency of the evidence, the facts need to be stated in some detail. The decedent, Carl Edward Raney (a/k/a Tag), executed his last will and testament on October 27, 1987, and died on January 17, 1989. He married Rosa Lee Raney in May 1947; they were divorced in October 1981.

By all accounts, decedent was a difficult person to live with. His former wife, Lee, testified that he controlled everything and everybody with his anger. If the family did what he wanted, then it was not bad, and they all got along fairly well. Decedent had always drunk alcohol, but after his father died in 1970, his drinking became a daily occurrence. Decedent was close to his father, and, after his father's death, decedent's mother and sisters sued him over division of the estate. This litigation "wounded" decedent severely, causing stress that he did not handle well. The fear, anger, and hurt decedent felt after the loss of his father and the litigation involving his father's estate were apparently transferred or displaced from his mother and sisters to his wife and children.

Decedent's daughter, Virginia, lived abroad from January 1975 until May 1985. At one point, her father called her frequently and was angry because she had loaned her mother money when her mother and father had divorced.

Decedent's son, Wayne, attended two years of college in Colby and one year at Kansas State University and returned home in 1975 to drive a tractor for his father. Wayne was involved with a girl and planned to marry her, but his father would not let him leave the farm, and the relationship ended. Decedent would hide keys and let air out of tires to keep Wayne from leaving. Wayne testified that after Lee found and gave him the keys to the 1966 Ford that summer in 1975, "I started it up and I left and I didn't look back."

Decedent's son, Carl, farmed for his father until 1976. After his father fired him, Carl began to farm for his father's former landlord, which angered decedent. Through a loan, Carl began to purchase equipment and, in 1977, moved into an old farmhouse that he leased from his father. Carl testified that, in 1978 and

1979, he may have done some custom work for his father; in 1980, Carl farmed his parents' property at the request of the court in their divorce action. After the divorce, his mother, who received six quarters of land in the property settlement, as well as equipment, leased her land to Carl to farm. He bought her farm equipment.

Carl attempted to help his father manage his finances over the next few years, but, on May 24, 1985, Carl wrote a letter stating that he wanted no more responsibility concerning his father's affairs. Carl sent a copy of the letter to Gene Shore, who was the husband of decedent's sister, Janet Shore, and to decedent's mother. One item that Carl did not want to deal with was the sale of decedent's house in Colorado Springs, Colorado. Decedent had given Carl a power of attorney to handle this sale but would not consider offers that Carl presented. In addition, one of decedent's five quarter sections of land in Stanton County was being foreclosed. Carl anticipated that the proceeds from the sale of decedent's house in Colorado Springs would be used to redeem the property being foreclosed in Stanton County.

Gene Shore testified that the house in Colorado Springs was sold for more than the first offer, with decedent receiving almost $50,000. Decedent carried the check for these proceeds in his pocket for several days until Shore took him to the bank and had him deposit it. In mid-1985, the land being foreclosed in Stanton County was sold at a public auction. At decedent's request, Shore bought the land on his behalf. Later, decedent changed his mind about redeeming the land from Shore, who feared that he would be stuck with property that he did not want. In the end, the property was redeemed by the conservatorship.

Some time between Carl's May 24, 1985, letter to his father and the filing of the conservatorship on August 27, 1985, decedent's children met at their mother's house and decided to seek a conservatorship for their father. The decision occurred soon after decedent appeared at Carl's farm with a gun. Carl was not present at the time, but decedent talked to Carl's employee and threatened to harm Carl. Decedent's other son, Wayne, was present but did not talk with his father.

When decedent learned of the conservatorship, he transferred $46,000 from the proceeds of the sale of the Colorado Springs

house to his mother, Edith Raney. The conservatorship sued to retrieve the $46,000. After using these proceeds to redeem the Kansas property, the conservatorship obtained a $160,000 loan secured by a mortgage on all the Kansas property. Prior to this, three of the five quarter sections had not been encumbered.

For financial reasons, Carl organized a corporation called Raney Farms, Inc., (Raney Farms) to handle his farm work. Raney Farms rented decedent's land from the conservatorship. At this time, Lee owned 100% of the shares of Raney Farms. Carl did not tell his father that the land in the conservatorship had been rented to Lee's corporation, and the record does not indicate how decedent learned of this arrangement. Carl planted the crops and was paid by the conservatorship. The next year, the land was placed in the Conservation Reserve Program (CRP), and the conservatorship received the CRP payments.

Decedent received repeated counseling and treatment for his alcoholism and anger. He was an inpatient at Prairie View from September 1985 to January 1986, where he became a patient of Dr. Bellows-Blakely, a psychiatrist. When Dr. Bellows-Blakely first saw decedent, decedent was debilitated. According to Dr. Bellows-Blakely, decedent had a complex character: He had a dependent personality and needed to be taken care of but, at the same time, resented his dependency. Although decedent was suspicious of anyone connected with his assets, Dr. Bellows-Blakely did not believe that decedent was psychotic. He described psychotic behavior as a thought disorder in which someone loses contact with reality and holds a view that would be contrary to that of a reasonable person. In Dr. Bellows-Blakely's opinion, decedent had a mixed personality disorder with borderline, dependent, passive-aggressive, and paranoid traits; had chronic alcoholism that he refused to acknowledge; and had organic personality syndrome. In September 1987, the doctor concluded that decedent had the mental capacity to manage his own affairs if he would not distort the world. The doctor testified decedent was bent on revenge or a vendetta with his family and could not get off that line of thought long enough to put his life together. The doctor viewed decedent's wish for revenge as a psychological defense mechanism protecting him from the awful reality of the wreckage of his life, in which he had participated.

After four months as an inpatient at Prairie View, decedent did not want to participate in its outpatient program and was transferred to Larned State Hospital. Later, he participated in the Omni Program at Dodge City Mental Health Center. His social worker, Ron Rinehart, saw decedent on a daily basis. Rinehart observed that decedent cared about and maintained a good physical appearance even though he was depressed. Without question, decedent knew who his relatives were and what property he owned. Decedent became so angry concerning the conservatorship that he could not talk about it. His meetings with his family were short confrontations. Decedent wanted someone to take care of him, but Rinehart observed that decedent was doing well on his own. According to Rinehart, decedent was never delusional, although he blamed his children for his situation and was very angry with them.

Decedent left the Omni program in Dodge City without approval. Driving a car he bought with money saved from the allowance he received from the conservatorship, he was arrested for DUI and driving left of center. He was incarcerated in the Stanton County Jail from July 11, 1987, to January 7, 1988. Dr. Roger Troup, decedent's physician and friend, described decedent as a "snowbird"—someone who is comfortable, and wants to be, in jail. Dr. Troup explained that when decedent was in jail, he got out from under the control exercised by the conservatorship. Dr. Bellows-Blakely noted that decedent considered being under the conservatorship very similar to being in jail because one lost control over one's life in both settings.

Jim Garrison, Stanton County Sheriff, knew decedent from numerous encounters resulting from domestic arguments. He knew decedent resented the conservatorship because conversations with decedent always got to that issue. On October 27, 1987, decedent executed his will while in jail. Sheriff Garrison, who was present, had no doubt that decedent was of sound mind and knew what was going on when signing the will.

Evan Nightingale, the attorney who drafted the will, died on December 26, 1988, just prior to decedent's death. His partner, Shirley Kyner, was a witness to the execution of the will. Kyner had no question in her mind that decedent was competent to execute the will on October 27, 1987. Nightingale had decedent

discuss his property and family. The entire procedure was videotaped, but, at the time of trial, the parties thought the video had been destroyed by Nightingale's overzealous brother-in-law.

During the summer of 1988, when decedent was not incarcerated and had stopped by Kyner's office to see Nightingale, he indicated to Kyner his belief that his children were greedy and had established the conservatorship because they wanted his estate and wanted him out of the way. He was angry about the mortgages that the conservatorship had placed upon his property. Also, decedent believed the conservatorship was costing too much.

According to Rayna Jo Brown, Stanton County Deputy Sheriff, decedent was well liked by other inmates and was a jail trustee. He talked about the stock market and other issues that indicated that he was intelligent and knew what was going on.

Brown notarized the will. During its execution, she recalled that the attorney and decedent discussed the amount left to the children. Although decedent wanted to leave $1.00 to each, his attorney wanted him to be reasonable and leave $25.00 per child. Brown stated decedent seemed to be of sound mind and competent at the time the will was executed.

A woman from the local newspaper came weekly to the sheriff's office to obtain news releases. Once, decedent asked if he could place an advertisement in the paper. She agreed, and the sheriff's department did not disapprove. Decedent's son, Carl, did not like the advertisements. He came to the sheriff's office two or three times very upset and angry, indicating that decedent should not have access to the paper and that the paper and the sheriff's office were very irresponsible. He also complained to the editor of the newspaper.

Copies of several advertisements appear in the record. Two concern court hearings. One of these, which was read into the record at trial, states:

"NOTICE

Lee's Children (by her 1st marriage) has petitioned the Court for additional indebtedness to my estate. The hearing is at 11:00 a.m., Wed., December 18th. Public attendance at hearing appreciated.

CARL E. RANEY"

At trial, appellees asserted that decedent was operating under

an insane delusion because, on more than one occasion, he denied that Carl, Wayne, and Virginia were his children. At Prairie View, decedent told Dr. Bellows-Blakely, in regard to Carl, "That's not my kid." Dr. Bellows-Blakely agreed that decedent had denied that Carl was his child, but had done it "in kind of an angry 'You're no child of mine' kind of way where it was clear that he knew they were his biological offspring, but . . . he sure as heck didn't want to admit it." Decedent repeatedly told people that his ex-wife and children were killing him or had killed him by the divorce and the establishment of the conservatorship. He became convinced that his children were trying to control his property to preserve it for their use.

In the latter part of 1988, decedent learned that he had terminal cancer and was given three months or less to live. He died on January 17, 1989.

In concluding that decedent suffered from an insane delusion at the time he executed his will, the trial court noted that Dr. Bellows-Blakely had referred to decedent's mental state regarding his property as controlled by distorted thinking. According to Dr. Bellows-Blakely, decedent had a mental disorder that prompted him to believe that his children should be punished and should not have his property. But Dr. Bellows-Blakely resisted calling decedent delusional. To him, a delusion meant a loss of consensual reality, *i.e.*, a belief in something that most reasonable people would consider to be fallacious. The doctor believed decedent had distorted thinking in believing that his children were out to get him, but pointed out that the "bad blood" in the family was enough to cause reasonable persons to be confused about what was going on in the family and that, therefore, this distortion was understandable. The doctor defined delusion fairly strictly, as did other psychiatrists, by requiring a major loss of consensual reality and by requiring a belief to be patently absurd to reasonable people. Dr. Bellows-Blakely admitted that decedent's actions would be called delusional under the definition contained in Stedman's Medical Dictionary, which defines delusion as "a false belief or wrong judgment." He criticized that definition, stating:

"And it's a pretty broad definition of delusion. If you use that definition of delusion, Carl Raney was delusional. I'm afraid if we use that definition of

delusional, you and I and everybody else in this room has been delusional at one point or another in our lives, so I think it's too broad a definition."

Dr. Bellows-Blakely agreed that the provisions of the will taking everything away from his children and giving it to his sisters were consistent with decedent's distortion. Decedent's sisters were no longer involved in the management of his affairs, and one sister was taking care of his needs by providing him with a place to stay.

At one point, the doctor tried to clarify why he did not believe that decedent was delusional. The doctor stated delusional people often have a reason for what they believe, but the rest of the world still calls them delusional because the basis for the belief is not reasonable. Here, decedent was frightened of his son, Carl, and felt that, at one point, Carl had threatened his life. Decedent also believed that his son was trying to take his property, was trying to farm his property, and was trying to gain from farming his property. The son *was* farming decedent's property, but, according to the doctor, his intentions were not clear. The son explained that he working to conserve decedent's assets, but, as the doctor pointed out, this conservation benefited the son if he inherited decedent's estate. The doctor had trouble calling decedent's belief a delusion because it was probably based on some truth. When the doctor evaluated decedent in September 1987, he concluded that decedent had the intellectual capacity to know the nature and extent of his property, would have known if he were making a will to exclude his children, and would have understood the effect of the legal instrument. Through discussions with decedent, Carl, decedent's sister, and his social worker at Omni, the psychiatrist concluded that decedent's belief that his children and ex-wife were siding against him was at least partially based in fact. The doctor admitted that if no evidence supported decedent's belief, his thinking would be delusional.

The trial court concluded that no evidence existed "that the decedent's children or his sisters or mother ever acted contrary to the decedent's personal interests, and the decedent's mental condition was an insane delusion in this regard." The court relied upon a close reading of the psychiatrist's deposition and the actions of decedent to provide evidence of his delusion toward his

children's actions. The trial court also adopted appellees' findings of fact and conclusions of law. Paragraph 10 of appellees' conclusions of law states:

"The Last Will and Testament of Carl Edward Raney dated October 27, 1987, was the product of an insane delusion and on October 27, 1987, Carl Edward Raney did not possess the requisite testamentary capacity to make a valid Last Will and Testament and said will should not be admitted to probate as the Last Will and Testament of the decedent."

The principal challenge in this appeal is to the trial court's finding that decedent did not have the requisite testamentary capacity at the time the will was executed. The first four proposed conclusions of law, as adopted by the trial court, correctly state the requirements for determining testamentary capacity. In *In re Estate of Ziegelmeier*, 224 Kan. 617, Syl. ¶ 1, 585 P.2d 974 (1978), this court noted that a deceased possessed testamentary capacity if, on the date he executed his will, he knew and understood the nature and extent of his property and had an intelligent understanding of the disposition he desired to make of it; he realized who his relatives were and the natural objects of his bounty; and he comprehended the nature of the claims of those whom he desired to include and exclude from participation in the distribution of his property. In determining testamentary capacity, the crucial time is when the will is made and executed; evidence concerning capacity before or after that time is only an aid in deciding the primary question. *In re Estate of Barnes*, 218 Kan. 275, 281, 543 P.2d 1004 (1975). Here, petitioners had the burden of proving the lack of testamentary capacity because of an insane delusion. *In re Estate of Carothers*, 220 Kan. 437, 443, 552 P.2d 1354 (1976). As long as the requisite mental capacity exists, a person has the power to dispose of the property as he wishes, and this power should not be interfered with by the court. *In re Estate of Brown*, 230 Kan. 726, 730, 640 P.2d 1250 (1982).

The trial court recognized that being under a guardianship and conservatorship does not necessarily deprive one of the power to make a will. Incompetency to transact business is not the equivalent of insanity and does not mean that the testator lacks testamentary capacity. Previously, this court concluded that an aged person who was " 'feeble-minded and incapable of managing his

affairs' " and who needed a guardian could, three weeks later, be competent to make a will. *In re Estate of Hall,* 165 Kan. 465, 469, 195 P.2d 612 (1948) (quoting *Mingle v. Hubbard,* 131 Kan. 844, 293 Pac. 513 [1930]). In *Hall,* the court stated: "It is practically a universal rule that the mere fact that one is under guardianship does not deprive him of the power to make a will." 165 Kan. at 469 (citing Annot., 8 A.L.R. 1375). The test is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions or has absolute soundness of mind, but whether a person can understand what property he has and how he wants it to go at his death, even if he is feeble in mind and decrepit in body. 165 Kan. at 469-70. The testimony of expert witnesses is important in determining mental capacity and should receive proper consideration by the trial court, but does not bind the trier of fact. 165 Kan. at 469.

Appellants correctly argue that the evidence was uncontroverted at trial that decedent understood the nature and extent of his property, knew his relatives and the natural objects of his bounty, and realized the nature of the claims of those he desired to include and exclude in the distribution of his property. The trial court concluded that he had testamentary capacity on October 27, 1987, but concluded that he had exercised this capacity while suffering from an insane delusion.

Appellants argue that the trial court misapplied the law in finding that decedent suffered from an insane delusion when he executed his will. In its memorandum, filed June 26, 1989, the trial court does not set out the standard it applied, but appellees' proposed conclusions of law, which were adopted by the trial court in its memorandum, set forth the following definition of an insane delusion given by this court in *In re Estate of Carothers,* 220 Kan. 437, Syl. ¶ 1:

"The meaning of insane delusion, in its legal sense, is a belief in things impossible, or a belief in things possible but so improbable under the surrounding circumstances that no man of sound mind would give them credence. It is a belief which has no basis in fact or reason."

Appellants note that an insane delusion has also been described as "a belief which is not founded on evidence, since if there is any evidence, however slight or inconclusive, which might have a tendency to create a belief, such belief is not a delusion." 79

Am. Jur. 2d, Wills § 91, pp. 343-44. This treatise further notes that one cannot be said to act under an insane delusion if this condition of the mind results from an inference or process of reasoning, however illogical, drawn from facts which are shown to exist. Accordingly, the essential question is "whether the testator had before him any facts on which his belief might have been founded, irrespective of the actual evidential force of such facts. It matters not that other persons would not necessarily agree with him, or that his judgment on the facts was harsh, unjust, and insupportable." 79 Am. Jur. 2d, Wills § 91, p. 344.

In addition to the definition of insane delusion used in *Carothers*, this court has also noted that a belief does not amount to an insane delusion unless it is

" 'wholly without any basis whatever, and . . . the testator obstinately persist[s] in it against all argument which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion.' " *In re Estate of Millar*, 167 Kan. 455, 459, 207 P.2d 483 (1949) (quoting *Stull v. Stull*, 1 Neb. [Unof.] 389, 396, 96 N.W. 196 [1902]).

Appellants also point this court to *Akins v. Akins*, 109 Kan. 453, 199 Pac. 922 (1921), in which the plaintiff sought to set aside his father's will because he was a constant and excessive user of intoxicating liquor, was unduly influenced by two daughters, and was under an insane delusion at the time he made his will. Some evidence indicated that decedent used intoxicating liquor excessively, abused the plaintiff, and believed that plaintiff had wronged him, but other evidence indicated that he was of sound mind and had testamentary capacity. The court saw no evidence of undue influence. The claim of insane delusion arose after plaintiff and his father disagreed about the sale of decedent's feed business, and decedent accused plaintiff of wronging him. The evidence almost conclusively established that plaintiff did not wrong his father, but the sale contained elements that would "excite the suspicions of many men." 109 Kan. at 456. Although decedent was mistaken, a mistake is not an insane delusion. "A mistaken belief entertained by one that he has been wronged by another is a very common frailty of humanity, but such belief is not necessarily an insane delusion." 109 Kan. at 456. The court

set out the following quote from *Wisner v. Chandler*, 95 Kan. 36, 50, 147 Pac. 849 (1915), which, in turn, had quoted from a Michigan decision, *Bean v. Bean*, 144 Mich. 599, 108 N.W. 369 (1906):

" ' "The opinion of a father that certain of his children, whom he disinherited, had wronged and cheated him, and were scheming to get possession of his property, cannot be said to be the result of insane delusions, so as to invalidate his will, where there were real controversies between them which may have given rise to his belief, irrespective of which of the parties might have been able to make the better showing of real right." ' " 109 Kan. at 456.

In Kansas, a testator's belief will not be considered an insane delusion if any facts, however little evidentiary force they may possess, exist upon which the testator could base his belief. The trial court found no evidence that decedent's children, sisters, or mother "ever acted contrary to the decedent's personal interests," and noted that the definition of insane delusion contained at 79 Am. Jur. 2d, Wills § 87, p. 340, "is not so much a definition of the infirmity as a definition of the evidence necessary to prove it." This section of Am. Jur. is instructive and is helpful in understanding whether an insane delusion exists. The provision states:

"[T]o avoid a will because the testator entertained a delusion, the delusion must be an insane delusion, and the will must be the product thereof. An insane delusion which will render one incapable of making a will is difficult to define, but, generally speaking, it may be defined as a belief in things which do not exist, and which no rational mind would believe to exist. It is such an aberration as indicates an unsound and deranged condition of the mental faculties. The essence of an insane delusion is that it has no basis in reason, cannot be dispelled by reason and can be accounted for only as the product of mental disorder.

"An insane delusion is not established when the court is able to understand how a person situated as the testator was might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. There is no such thing as a delusion founded on facts or on a process of reasoning from facts. A person may harbor insane delusions and yet have testamentary capacity. A hallucination which indicates an overwrought imagination but not an impairment of normal testamentary capacity does not invalidate a will." 79 Am. Jur. 2d, Wills § 87, pp. 340-41.

In addition to the statement given by the trial court in its memorandum, ¶ 6 of the proposed conclusions of law that were

adopted by the trial court states: "Delusion is defined as a false belief or wrong judgment. *Stedman's Medical Dictionary,* 22nd Edition, 1972, p. 331." This was the definition of delusion that was disapproved by Dr. Bellows-Blakely because psychiatrists would define the term more strictly as "a belief that most reasonable people would consider to be fallacious," or a major "loss of consensual reality." A delusion has to be patently absurd to reasonable people before it is considered a real delusion.

The definition of insane delusion used by Dr. Bellows-Blakely is similar to that adopted by this court. A mistaken belief by decedent that his children had established the conservatorship in order to preserve his estate for themselves is not an insane delusion if it is based upon facts that may give reason for this belief. See *In re Estate of Millar,* 167 Kan. at 459. Whether decedent's children, sisters, or mother ever acted contrary to his personal interests is not relevant to deciding whether decedent suffered from an insane delusion at the time he made and executed his will. The trial court erred in concluding that decedent suffered from an insane delusion at the time he executed his will because evidence exists in the record to support decedent's belief that he was being wronged by his children, even if the evidence almost conclusively shows that his children in fact did not wrong him in the management of his affairs or his estate. See *Akins,* 109 Kan. at 456. The distinction between a mistake and an insane delusion is " 'that a mistake, whether of fact or law, moves from some external influence which is weighed by reason, however imperfectly; while a delusion arises from a morbid internal impulse, having no basis in reason.' " *Akins,* 109 Kan. at 456-57 (quoting *Taylor v. McClintock,* 87 Ark. 243, Syl. ¶ 12, 112 S.W. 405 [1908]). Here, the trial court applied an incorrect standard in determining whether decedent was suffering from an insane delusion at the time he made and executed his will.

Appellants also argue that the evidence does not support a finding that decedent suffered an insane delusion when executing his will. In its memorandum, the trial court stated that it found no evidence "that the decedent's children or his sisters or mother ever acted contrary to the decedent's personal interests, and the decedent's mental condition was an insane delusion in this regard." The problem with this conclusion is that the test is not

whether decedent's children acted contrary to his personal interests, but whether the individual holds a belief in things impossible, or a belief in things possible but so improbable under the surrounding circumstances that no person of sound mind would give them credence. *In re Estate of Carothers*, 220 Kan. 437, Syl. ¶ 1. Therefore, if decedent believed things to which a person of sound mind would give credence based upon the surrounding circumstances, the individual is not suffering from an insane delusion. If the belief held by decedent had a basis in fact or reason, then his mental condition is not an insane delusion.

In ¶ 7 of appellees' proposed conclusions of law, adopted by the trial court in its memorandum, beliefs of decedent that presumably established an insane delusion are listed. They include: (1) Decedent's former wife divorced him for greed and to obtain his property; (2) his children acted in concert with his former wife in filing the guardianship and conservatorship proceeding; (3) the guardianship and conservatorship were established for the sole purpose of "getting him out of the way so they could get the balance of his property" and to preserve his property for their inheritance; and (4) he was competent and capable of handling his own affairs and therefore needed no guardianship or conservatorship. The proposed conclusions of law then summarize the evidence as follows:

"8. All of the evidence in this case indicates that his wife had ample grounds for divorce and that the property division was one made pursuant to the laws of Kansas and was fair and reasonable; that the children had good and sufficient reasons to commence the guardianship and conservatorship proceedings and there is no evidence tending to support the decedent's belief that the co-guardians and co-conservators were trying to get him out of the way in order to get the balance of his property, in their own right or in collusion with their mother, or conserving his estate for their own inheritance. Decedent's belief in those things was so improbable under the surrounding circumstances that no person of sound mind would have given them credence and was without any basis in fact or reason."

Unquestionably, decedent's wife had ample grounds for divorce. After decedent's drinking increased, he inflicted physical and mental abuse upon his wife. What little evidence was introduced about the property division in the divorce indicates that it was fair and reasonable, and it is not challenged by the parties. All witnesses agreed that decedent needed a guardianship and

conservatorship in 1985 because his drinking was out of control and he was unable to handle his affairs. Contrary to the final assertion in ¶ 8 of the proposed conclusions of law, however, evidence does exist to support decedent's belief that the conservators were trying to conserve his estate for their own inheritance.

The conservators argue that they were merely trying to preserve the estate to ensure that funds would be available to provide for their father during his life. The problem, as pointed out by Dr. Bellows-Blakely, is that, in preserving the estate for their father's needs, they were also preserving the estate for their inheritance *if* he did not use a testamentary device to give the property to other people. The most obvious indication that they were concerned about their own inheritance is their involvement in this litigation contesting the will executed by their father.

Many acts by the conservators could support decedent's belief that they were out to protect their own interests. First, the letter sent by Carl to his father, with copies to Edith Raney and Gene Shore, spells out Carl's frustration from assisting his father in handling his financial affairs. Three months after his pledge not to handle his father's affairs, Carl, with his brother and sister, had the conservatorship established. Although they acted as co-conservators, clearly Carl was the individual who took the responsibility of handling his father's affairs. He never talked with his father about anything the conservatorship did. He did not tell his father that the land had been rented to Raney, Inc., the corporation that Carl established and that was owned by decedent's former wife. Carl, who was employed by the corporation to do the farming, knew his father did not want him to farm his property. Carl also knew that his father opposed placing a mortgage on any of the property that was unencumbered or placing the land into CRP.

At the time the conservatorship was established, three quarter sections of land were unencumbered, and a fourth was redeemed using proceeds from the sale of the Colorado Springs house. When the conservatorship was established, the net worth was $393,977.06. Four years later, on May 1, 1989, at the trial of this proceeding, the value of the estate was $297,423,53. After the conservatorship was established, instead of following dece-

dent's wishes of selling the land and having the proceeds available to invest on his behalf, the conservatorship acquired a long-term loan that encumbered the entire property for proceeds of approximately $140,000. The interest on the note was $46.19 per day.

The conservators argue that the encumbrance upon the land was approved by the court and was used to pay off the numerous liabilities that had accumulated prior to the establishment of the conservatorship. At the time the conservatorship was established, the liabilities were $126,020.06. At the time of the trial, the liabilities for the conservatorship were $174,276.93. No one contests the decision by the conservators to acquire a long-term loan in order to pay off the immediate debts of the conservatorship. However, the conduct of the conservators, by acquiring a long-term note that they knew was against the wishes of decedent, by leasing the property for farming to the corporation held by decedent's ex-wife and run by the son decedent did not want to farm his land, and by refusing to consult with decedent about their decisions, gave credence to decedent's belief that the conservators wanted him out of the way to control and conserve his estate for their inheritance. As this court noted in *Akins*, 109 Kan. at 456, the fact that the conservators did not wrong their father in the management of his business affairs is not the test. Decedent may have been mistaken in his belief that the conservators were attempting to control his affairs to preserve their inheritance, but their conduct supported his belief, even if it was erroneous.

Finally, decedent's belief was not so improbable under the circumstances that no person of sound mind would give it credence; decedent's belief was not without basis in fact or reason. Dr. Bellows-Blakely gave credence to decedent's beliefs, although he recognized that the conduct of the conservators by conserving decedent's estate to pay for expenses during his lifetime also protected the conservators' inheritance. Once again, the test is not whether decedent's belief is correct; the test is whether the belief is so improbable under the surrounding circumstances that no person of sound mind would give it credence. Gene Shore also gave credence to decedent's belief. He did not contest that a conservatorship was needed or criticize the decisions of the

conservators. For example, he agreed that CRP was appropriate even though decedent resisted it. Shore refused to predict what he would have done if named conservator, but questioned the rapid decline in the value of the conservatorship, noting especially the amount that had been expended in attorney fees.

The argument that decedent was suffering from an insane delusion because he disclaimed the conservators as his children has no merit. His statement to Dr. Bellows-Blakely and the newspaper advertisement referring to them as "Lee's Children (by her 1st marriage)" indicated a disgruntled parent who did not want to recognize the conduct of his children. The doctor did not doubt that decedent knew that the conservators were his biological children.

The advertisements in the local newspaper were a rather ingenious way for decedent to get back at his children for their conduct as conservators. Decedent did not want his land encumbered and placed into CRP. These advertisements allowed him to express his dissatisfaction publicly and to invoke the ire of his son, Carl.

Also, nothing indicates that Lee Raney was ever married to anyone other than decedent; therefore, the reference to "Lee's Children (by her 1st marriage)" does not necessarily indicate that decedent believed the children were the biological offspring of anyone other than himself.

If any facts exist upon which a testator may reasonably have based his belief, then it will not be an insane delusion. *In re Estate of Millar*, 167 Kan. at 459. Here, it appears that decedent's belief may have been mistaken, but this is a very common frailty of humanity. *In re Estate of Carothers*, 220 Kan. 437, Syl. ¶ 3. Such a mistaken belief is not an insane delusion and will not deprive a testator of the capacity to execute a valid will. *In re Estate of Millar*, 167 Kan. 455.

The decision of the trial court finding that decedent had acted under an insane delusion at the time he executed his last will and testament is contrary to the evidence. As noted earlier, the appellees have the burden to establish that decedent lacked testamentary capacity. The evidence is overwhelming that decedent had the requisite testamentary capacity on October 27, 1987. Facts existed upon which decedent could have reasonably based

his beliefs that led him to draft a will leaving his property to the appellants, and, therefore, the will was not the product of an insane delusion. Viewing the evidence in the light most favorable to the appellees, we conclude that the finding of the trial court is not supported by substantial competent evidence and, therefore, the trial court erred in denying the petition for probate of decedent's will. In view of our decision, the other issue raised by the appellants need not be addressed.

The appellants have filed an application for their costs, attorney fees, and expenses pursuant to Supreme Court Rule 7.07(b) (1989 Kan. Ct. R. Annot. 37). Rule 7.07(b) provides that this court may award attorney fees on appeal in any case in which the trial court had authority to award attorney fees. K.S.A. 59-1504 grants the trial court such authority in this case. The appellants' application for attorney fees and costs is granted.

The judgment of the district court is reversed, and the case is remanded for further proceedings.