The PEOPLE of the State of
Colorado, Complainant

v.

Robert Scott FISHER, Respondent.

Nos. 06PDJ038, 06PDJ104.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

Oct. 30, 2007.

On July 24–26, 2007, a Hearing Board composed of KAY SNIDER, JOHN E. HAYES, both members of the Bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the Court"), held a hearing pursuant to C.R.C.P. 251.18. Charles E. Mortimer, Jr., appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Robert Scott Fisher ("Respondent") appeared *pro se.* The Hearing Board issues the following Opinion and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19 based upon the presentation of the parties.

## OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19

### I. *ISSUE*

Suspension is appropriate when a lawyer *knowingly* fails to perform client services. Public censure is appropriate when a lawyer *improperly* acquires a pecuniary interest adverse to his client. Respondent secured a deed of trust from his client to assure payment of his fees while representing her in a divorce proceeding. He thereafter exercised his rights in the deed, but failed to follow through with the steps necessary to secure court ordered benefits for his client. What is the appropriate sanction for his misconduct?

### II. *SUMMARY*

The Hearing Board specifically finds clear and convincing evidence in the *first* Complaint that Respondent violated: [1]

- Colo. RPC 1.1, Count V, (a lawyer shall provide competent representation to a client), and Colo. RPC 1.3, (A lawyer shall not neglect a legal matter entrusted to him).

The Hearing Board does *not* find clear and convincing evidence as to Colo. RPC 1.7(b), Count III, (a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's respon-

---

1. Claims I and II have been established by virtue of the Court's ruling on summary judgment in the *first* Complaint.

sibilities to the lawyer's own interests). With regard to the *second* Complaint, the Hearing Board does *not* find clear and convincing evidence as to:

- Colo. R.P.C. 3.3(a), First Claim, (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal, (no duty to disclose));

- Colo. R.P.C. 3.4(c), Second Claim, (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists); and

- Colo. R.P.C. 8.4(c), Third Claim, (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

*SANCTION IMPOSED: ATTORNEY SUSPENDED FOR SIX MONTHS, ALL STAYED UPON THE SUCCESSFUL COMPLETION OF A TWO–YEAR PERIOD OF PROBATION WITH THE CONDITION THAT RESPONDENT SUCCESSFULLY COMPLETE THE OFFICE OF ATTORNEY REGULATION'S ETHICS SCHOOL.*

## II. *PROCEDURAL HISTORY AND BACKGROUND*

On June 6, 2006, the People filed case number 06PDJ038. Respondent filed his answer on July 10, 2006. On April 23, 2007, the Court granted a motion for summary judgment filed by the People as to Claims I and II of the *first* Complaint and denied the People's motion as to Claim IV.

On December 27, 2006, the People filed 06PDJ104 and the Court consolidated it with 06PDJ038. Respondent filed an answer to the *second* Complaint on January 18, 2007. Respondent filed numerous motions for summary judgment on the consolidated cases and Court denied each of them.

## III. *FINDINGS OF MATERIAL FACT*

The Hearing Board considered the testimony of witnesses and exhibits admitted into evidence, and now makes the following findings of material fact by clear and convincing evidence.[2]

Respondent took and subscribed the Oath of Admission and gained admission to the Bar of the Colorado Supreme Court on November 1, 1985. He is registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 14996. Respondent is therefore subject to the jurisdiction of this Court in these disciplinary proceedings pursuant to C.R.C.P. 251.1(b).

### *Shirley Varner Retains Respondent*

Respondent is a sole practitioner from Colorado Springs who specializes in family law. On June 12, 2003, Shirley Varner retained Respondent to represent her in a divorce case. Mrs. Varner was approximately fifty years old at the time. She had been married to Mr. Varner for thirty-four years and they had raised two children. She had retired from federal civil service with a disability for which she received approximately $785.00 per month.[3] At the time of the divorce, she suffered from depression, diabetes, recent back surgery, and emotional distress as a result of her son's recent suicide.

When Mrs. Varner hired Respondent, her case had already been set for a final orders hearing. Soon after Ms. Varner retained Respondent, they entered into a written fee agreement where she initially paid him a retainer of $2,000.00.[4] In conferring with Respondent, Mrs. Varner advised him that she wanted to remain in the marital residence and secure her right to survivor benefits in her husband's federal retirement plan through the Office of Personnel Management ("OPM"). Equity in the marital residence and the husband's pension plan were the principal assets of the marital estate.[5]

OPM rules and regulations outline the process a claimant must follow before they will

---

2. The Hearing Board's findings also incorporate stipulated facts submitted by the parties.

3. *See* People's Exhibit 2.

4. *See* People's Exhibit 1, the fee agreement.

5. Respondent advised Mrs. Varner that he would seek spousal maintenance and attorney fees.

alter the named beneficiary of a pension plan. A state court order may or may not be recognized by the OPM depending in part upon the language of the order *and* compliance with the OPM's regulations in processing such an order. In discussing her desire to obtain a survival benefit from her husband's federal retirement plan, Mrs. Varner asked Respondent if he had ever processed such a claim. Respondent assured her that he knew how to secure such benefits. As a result, Mrs. Varner expected him to process and secure the survival benefits in her husband's retirement plan.

### Respondent Presents a Promissory Note and Deed of Trust to Mrs. Varner

On November 7, 2003, shortly before the court completed the final orders hearing, Respondent met with Mrs. Varner to discuss the status of her bill. At that time, she still owed Respondent $3,102.00 for services he had already provided to her.[6] Respondent then asked Mrs. Varner if she would be willing to sign a promissory note secured by a deed of trust on the marital residence. He explained to her that these documents were necessary to ensure payment of his fees, but that courts often ordered husbands to pay these fees. While Mrs. Varner signed both documents, she did so with reservation.[7] She felt concerned that such an encumbrance on the deed might make it more difficult to sell her home in the future. From this point forward, Mrs. Varner started to question whether Respondent was acting in her best interests.

The approximate amount of equity in the Varners' home was $14,134.00.[8] The terms of the deed of trust and promissory note did not allow Respondent to foreclose on her residence and he could only collect his fees if the house was sold or refinanced. The prom-

issory note had an annual interest rate of 8% on the principal amount due at that time ($3,102.00). Mrs. Varner also understood that payment of $3,102.00 covered *all* of Respondent's fees, including additional work Respondent needed to complete in order to secure her survivor benefits with OPM.

Respondent neither told Mrs. Varner of the advisability of seeking independent counsel before signing the deed of trust and promissory note nor did he give her a reasonable opportunity to do so. Furthermore, Respondent did not obtain the client's consent in writing as required by Colo. RPC 1.8(a)(2) and (3).[9]

### Final Orders

On November 12, 2003, the court concluded the final orders hearing and ordered the sale of the Varner residence and ordered the parties to pay their own attorney's fees even though Respondent had argued that Mrs. Varner should be awarded attorney's fees. The court also ordered that Mrs. Varner receive half of her husband's retirement benefits during his life and survivor benefits should he predecease her. Although the court did not grant his request, Respondent also argued that Mrs. Varner be allowed to receive maintenance. The court did order, however, that Mr. Varner pay Mrs. Varner $1.00 a year so that the court would maintain jurisdiction in the event that Mr. Varner received additional income following the divorce.[10]

Following the final orders hearing, the court entered its written order on January 20, 2004, based on a draft Respondent provided to the court. However, in drafting the order, Respondent failed to research OPM regulations to determine whether the language of his draft would protect his client's

---

**6.** The People do not challenge the reasonableness of Respondent's fees.

**7.** *See* People's Exhibit 3.

**8.** *See* People's Exhibit 4.

**9.** Colo. RPC 1.8(a)(1) states "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a

client unless (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client. . . ." The People did not argue that Respondent violated this provision of the rule.

**10.** *See* Respondent's Exhibits C and E.

interests under the OPM rules and regulations.

The written decree awarded Mrs. Varner both a present one-half interest in Mr. Varner's federal pension, and survivor benefits from Mr. Varner's pension. The decree states:

> Husband shall provide Wife with Survivor Benefit Plan (SBP) protection/insurance so Wife can continue to receive a share of Husband's future retirement benefits if Husband predeceases Wife.[11]

On November 12, 2003, the date the court issued its final orders, Respondent neither advised the court nor opposing counsel that he had obtained an interest in the marital residence nor did he supplement Mrs. Varner's previously filed affidavit with respect to financial affairs to show that he had taken a lien against the marital residence.[12] Furthermore, during this hearing, Respondent tendered a document to the court, which calculated the equity in the marital residence by subtracting estimated realtor commissions and encumbrances, including only the first and second mortgages against the residence, from an appraised value of the residence. The exhibit did not disclose that Respondent had acquired a deed of trust encumbering the marital residence.[13]

Leading up to, and following permanent orders, Mrs. Varner reiterated her concern about securing her half-interest in her husband's pension benefits. She gave Respondent OPM's phone number and asked him to call them. Mrs. Varner also told Respondent that she did not feel comfortable with Mr. Varner writing a check from his bank account to her each month in order to comply with his obligation to provide her half of his pension benefit monthly. She wanted the money to be sent directly to her from OPM. Although Mrs. Varner expressed these concerns, Respondent did not call OPM.

Because Respondent failed to secure Mrs. Varner's benefits with OPR, she received one-half of Mr. Varner's pension reliant upon her former husband's willingness to write her a check each month, not because OPM recognized that she was entitled to receive these funds directly from them based upon the state court's final orders.

Contrary to his earlier assurances to Mrs. Varner, Respondent had never processed a claim with OPR and was unaware of the procedures the federal government required to secure her interests in Mr. Varner's pension. Had Respondent inquired of OPM as Mrs. Varner requested, he would have discovered that the process was complex.[14] Because of the nuances of OPM rules, general practitioners often consult a lawyer with experience in processing a retirement or pension claim with OPR.[15]

### Mrs. Varner Orders Respondent to Stop Working

By March 29, 2004, Mrs. Varner believed Respondent had all of the information he needed to secure her benefits as the court ordered. She was also distrustful of him at this point and thought that his only purpose in calling her was to charge her additional fees for the calls or proposed office visits. She therefore directed Respondent to "stop all work" on her behalf.

Furthermore, Mrs. Varner felt Respondent and the real-estate agent he hired to sell her house were "ganging up" on her and unjustifiably accusing her of resisting their efforts to her home. She realized that her home had to be sold as the court ordered, but she was frequently unavailable due to her mental and physical conditions.

### Respondent Agrees to be Appointed Agent to Sign Closing Documents

On May 5, 2004, Mr. Varner's divorce attorney conferred with Respondent and later

---

11. *See* People's Exhibit 7. Although Respondent argues that this language gave Mr. Varner and his lawyer the responsibility for processing the pension benefit with the OPM, the normal practice is that the party benefiting from the order is responsible for taking any action necessary to secure the claim.

12. *See* People's Exhibit 5.

13. *See* People's Exhibit 4.

14. OPR rules and regulations are published in a forty-page document available to the public.

15. *See* the testimony of Thomas Henley.

filed a motion requesting that Respondent be appointed by the court to sign documents for Mrs. Varner at the closing of the sale of the marital residence. This motion, which contained a reference to Mrs. Varner's alleged lack of cooperation in the sale of the marital residence, was filed with Respondent's knowledge and concurrence. On May 7, 2004, the Court granted the motion. Respondent never informed Mrs. Varner about this pleading.

### Mrs. Varner checks the Court Record

Given her lack of confidence in Respondent, Mrs. Varner went to the courthouse to find out what action, if any, Respondent had taken on her behalf. In early May 2004, she discovered the order that authorized Respondent to sign the closing documents if she did not appear at the closing for the sale of her house. The motion, dated May 6, 2004, requesting the appointment of Respondent contained the following statement, "He [Respondent] agrees that the sale of the home is in his client's best interests and *acknowledges his client's potential risk to be cited for contempt if the transaction is not completed because of his client's actions.*" [16] In fact, Mrs. Varner had sent a certified letter to Respondent on May 4, 2004, stating that she intended to attend the closing.[17] Although Mrs. Varner advised Respondent that she intended to attend the closing, she was not willing sign any document that stated, "all proceeds" were payable to Respondent.[18]

### Respondent Takes Action to Secure His Fees

On May 6, 2004, Respondent filed a notice of attorney's charging lien pursuant to C.R.S. § 12–5–119 in El Paso District Court, 02DR4721, the divorce case, claiming attorney's fees in the amount of $6,640.97 *and* asserting a claim to Mrs. Varner's share of the proceeds of sale of the residence. On May 25, 2004, Respondent amended his lien to include other obligations that Mr. Varner owed to Mrs. Varner pursuant to the decree dissolving their marriage.[19]

In dealing with the title company on the sale of the Varner's home, Respondent asked the title company to make the proceeds checks payable to him and not Mrs. Varner.[20] Respondent wrote to the title company to ask them to assist him in collecting his fees ostensibly as Mrs. Varner's lawyer although she explicitly terminated him on March 29, 2004. In spite of Respondent's suggestion to the title company that he alone sign the closing documents and receive all the proceeds, they insisted that Mrs. Varner agree to such an arrangement and sign all closing documents.

The closing of the Varner residence occurred on May 25, 2004. Both Respondent and Mrs. Varner attended the closing. Respondent's promissory note for $3,102.00, plus interest, was paid from the proceeds of the sale, and his deed of trust was released. Respondent also received and retained the balance of the sales proceeds ($4,095.13) in trust based upon his attorney's lien in 02DR4721. The People do not contest the reasonableness of these fees or whether Respondent earned them.

Though the People do not question Respondent's fees, the attorney-client relationship between Mrs. Varner and Respondent had significantly deteriorated based upon the fees he charged her. At the closing, Respondent advised Mrs. Varner that he would be getting *all of the equity, both hers and Mr. Varner's,* from the sale of the house. Mrs. Varner questioned whether Respondent should receive all of the equity in the marital property, but nevertheless signed the documents authorizing him to receive them.

While Respondent secured his legal fees following final orders in the divorce case, he did not take any action to secure his client's

---

**16.** People's Exhibit 13 is dated May 6, 2004; two days after Respondent received notice from Mrs. Varner that she planned to attend the closing.

**17.** *See* People's Exhibit 11.

**18.** *See* People's Exhibit 16.

**19.** The court ordered that Mr. Varner pay Mrs. Varner one half of the money she expended to pay for their son's funeral. Mrs. Varner received none of the proceeds from the sale of her home.

**20.** *See* People's Exhibit 14.

survival benefits in Mr. Varner's pension. On June 4, 2004, he filed a motion to enforce his attorney's lien in the Varner dissolution of marriage action. The motion did not include a claim for the fees he charged Mrs. Varner for services associated with the collection of his fees, approximately $350.00. Thus, Respondent did not seek a judicial order or judgment awarding him $350.00 for the time associated with collection.

Respondent's rationale for keeping $350.00 more than the court allowed in its order is that his fee agreement allowed him to collect these funds. The fee agreement specifically states:

> In the event that legal action is necessary to recover attorney fees and costs from Client, Firm shall be entitled to its reasonable attorneys fees incurred in said legal proceedings, and for fees and costs incurred in the collection of what is due and owing. *Firm shall be entitled to its attorneys fees incurred for collection, whether or not suit is brought* (emphasis added).[21]

In his motion to enforce attorney's lien, Respondent also filed a form of order to enforce attorney's liens. District Court Judge Gilbert Martinez signed it on June 25, 2004, authorizing Respondent "to retain $3,581.63 of the $4,095.13 in his trust account, to satisfy the Petitioner's contractual obligations to him." Respondent thereafter mailed a letter to Mrs. Varner dated July 29, 2004, in which he advised her that he was keeping $350.00 based on the work he performed to enforce his attorney's lien.

On June 4, 2004, after collecting all of the proceeds from the Varner closing, filing his attorney's lien, and collecting the $350.00 he "incurred" in collecting his fees, Respondent filed a notice to withdraw from Mrs. Varner's case.[22] Before withdrawing, however, Respondent sent a letter to Mrs. Varner notifying her that he intended to withdraw from her case if she did not schedule an appointment with him. Respondent also wrote, "I

would like to review the specific charges that you believe were improperly made to your account so I can determine whether an adjustment should be made to your account."[23] Respondent, however, made no mention of his failure to call or inquire of OPM about Mrs. Varner's survivor benefits as she requested of him shortly after final orders in January 2004.

### OPM Stops Mrs. Varner's Benefits After Mr. Varner Dies

On April 22, 2005, Mr. Varner unexpectedly died of a heart attack. Since Mrs. Varner had to rely on Mr. Varner to write a check to her each month, she stopped receiving her half-share of his pension. Mrs. Varner, then filed a claim based upon her divorce decree, but her petition was denied, as was her appeal of the initial decision. She then sought the intervention of Congressman Joel Hefley.

Mrs. Varner received no benefits from May 2005 until November or December 2005. This loss of income caused her to forgo certain medications and caused her to be late on a number of her financial obligations. Ultimately, however, all of the benefits that had not been paid to Mrs. Varner were reimbursed to her. The evidence is insufficient to conclude that Congressman Hefley's inquiry of OPM's denial of Mrs. Varner's survival benefits influenced OPM to pay the claim they had earlier disputed. Further, insufficient evidence exists to find that the reason OPM ultimately recognized Mrs. Varner's claim to survival benefits in Mr. Varner's pension plan was based upon the final orders he prepared in the divorce court.

### IV. CONCLUSIONS OF LAW— SUBSTANTIVE ALLEGATIONS

The Hearing Board finds clear and convincing evidence in the *first* Complaint as to the following claims: [24]

 Respondent violated Colo. RPC 1.3, (A lawyer shall not neglect a legal matter

---

**21.** *See* People's Exhibit 1.

**22.** See People's Exhibit 22.

**23.** *See* People's Exhibit 19.

**24.** The Court ruled as a matter of law that Respondent violated Colo. R.P.C. 1.8(a) and (j). The Hearing Board therefore makes no findings or conclusions on Claims I or II of the *first* Complaint.

entrusted to him). The comments to Colo. RPC 1.3 state, "Unless the relationship is terminated as provided by Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client." Respondent undertook the task of securing his client's survival benefits in her husband's pension plan. While Respondent won a judgment from the trial court awarding Mrs. Varner these benefits, he did not take the next step to secure them. Thus, he did not accomplish one of his client's primary objectives for the representation.

■ In addition, Respondent violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client). In order for Respondent to competently represent Mrs. Varner, Respondent should have researched the necessary process to secure his client's benefits. "Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners." Comments Colo. RPC 1.1. If Respondent had taken these reasonable steps, he could have, at a minimum, been able to advise his client of the potential injury she might suffer if he was not allowed to continue working on her case to secure her benefits.

The Hearing Board considered Mrs. Varner's conduct following the final orders and her unwillingness to answer Respondent's calls. The evidence reveals that Respondent found it difficult to communicate with her following final orders. While her actions mitigate his ethical lapses, they do not excuse them.

■ With regard to the *first* Complaint, the Hearing Board finds that the evidence is not clear and convincing that Respondent violated Colo. RPC 1.7(b), Count III, (a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to the lawyer's own interests). Respondent had a right to collect his attorney's fees in the domestic court. An attorney may assert the lien in the action in which the attorney performed his services or by separate action. *Crabtree v. Crabtree,* 192 Colo. 550, 560 P.2d 835, 836 (1977).

And while it appeared to Mrs. Varner that the manner in which Respondent collected his fees was "sleazy," he had a right to collect his fees. Except for his lack of diligence and competence in securing her pension benefits, Respondent was a zealous advocate on behalf of his client. Further, there is no evidence to suggest Respondent did not earn the fees he collected. Given these circumstances, the evidence of a conflict is not clear and convincing.

■ With regard to the *second* Complaint, the Hearing Board cannot find clear and convincing evidence as to:

- Colo. R.P.C. 3.3(a), First Claim, (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal);
- Colo. R.P.C. 3.4(c), Second Claim IV, (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists); and
- Colo. R.P.C. 8.4(c), Third Claim, (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

The Hearing Board notes that these charges were brought nearly six months after the filing of the initial complaint. While the Hearing Board finds that it might have been better practice for Respondent to advise the court of his interest in the Varner residence, and the provisions in his fee agreement that allowed him to keep $350.00 more than the court ordered, there is no evidence to demonstrate that such disclosures would have changed the court's order regarding the sale of the residence. In fact, the evidence is to the contrary. As one judicial officer testified during the hearing, such information is not material in a determination of final orders.

## V. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") and Colorado Supreme Court case law are the

guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA Standards

■ Suspension is generally appropriate when a lawyer fails to perform services for a client. ABA *Standards* 4.42. However, in imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first consider the following factors:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the actual or potential injury caused by the misconduct; and

(4) the existence of aggravating or mitigating factors.

### A. THE DUTY VIOLATED

■ Respondent violated duties to his client, the legal system, and the legal profession by failing to diligently pursue his client's interests. *See* Colo. RPC 1.2 (a lawyer shall abide by a client's decisions concerning the scope and objectives of the representation). Here, Mrs. Varner made it clear from her first meeting with Respondent that she wanted to secure a survival benefits in her husband's pension. Respondent assured her that he knew how to achieve this objective when he did not. Respondent also had a duty under the rules to advise Mrs. Varner under Colo. RPC 1.8 before taking a deed of trust on her home to secure his fees.

### B. THE LAWYER'S MENTAL STATE

Respondent acted knowingly throughout his representation of Mrs. Varner. He was aware of his conduct when he failed to follow through and process Mrs. Varner's survival benefits. Likewise, he acted knowingly when he obtained a deed of trust and promissory note from Mrs. Varner. While the Hearing Board finds that Respondent may not have been aware that his conduct violated Colo. RPC 1.8, this is not necessary to our finding of knowing conduct.

**25.** *See* People's Exhibits 9 and 10.

### C. THE ACTUAL OR POTENTIAL INJURY

It was reasonable for Mrs. Varner to believe Respondent knew how to process an OPM claim after he made such assurances. But he was completely unaware of the process and the potential harm Mrs. Varner could suffer if her claim was not processed according to OPM procedures. At a minimum, there was serious *potential* injury to Mrs. Varner based upon Respondent's lack of diligence.

Furthermore, the profession is potentially injured each time one of its own fails to recognize that the practice of law is a profession with ethical obligations to the clients served and not simply a matter of running a business. Here, the impression Respondent left with Mrs. Varner was that he was much more interested in making money than protecting her interests.

Even though the Hearing Board finds a potential for serious injury, we are mindful that Mrs. Varner's physical and mental condition made it difficult for Respondent to complete her objectives following final orders.[25] Nevertheless, Mrs. Varner had a reasonable expectation that Respondent would secure survival benefits from her former husband's federal pension.

### D. AGGRAVATING AND MITIGATING FACTORS

#### 1. MATTERS IN AGGRAVATION, ABA *STANDARD* 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction to impose.

#### Selfish Motive—9.22(b)

The Hearing Board finds that Respondent's actions were motivated in part by his personal financial interests. We also recognize Respondent had a right to collect his fees. But we find that Respondent failed to follow through with her claim for half of her husband's pension benefit while zealously pursuing his personal interest in securing his fees. While we find this factor, we do not

weigh it heavily because Mrs. Varner stopped communicating with Respondent. Thus, his lack of action was not entirely based upon his selfishness. Mrs. Varner's unavailability was a significant factor.

### Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g)

While Respondent has cooperated in these proceedings, he has not demonstrated remorse for the potential injury he caused his client. Instead, Respondent argued in these proceedings that he helped, rather than injured, a client who would otherwise would have had to face a divorce without representation. He does not see his lack of diligence in any way contributing to the potential and actual injury Mrs. Varner suffered. Instead, he blames her for not contacting him and the OPM for making a mistake in initially denying her claim for benefits.

### Vulnerability of the Victim—9.22(h)

The Hearing Board finds Mrs. Varner vulnerability was exacerbated by her mental and physical condition. But we temper this finding. Respondent should not be held accountable for his client's failure to communicate.

### Substantial Experience in the Practice of Law—9.22(i)

Respondent has practiced law for approximately twenty-two years while specializing in domestic cases.

### 2. MATTERS IN MITIGATION, ABA STANDARD 9.3

The Hearing Board considered evidence of the following mitigating circumstances in deciding the appropriate sanction to impose.

### Absence of Prior Discipline—9.32(a)

Respondent has practiced as a solo lawyer specializing in domestic cases without a single blemish on his record. Difficult clients and issues are common to this practice. The Hearing Board gives *great* weight to this factor.

### Cooperative Attitude in the Proceedings—9.32(e)

Although Respondent vigorously defended himself in these proceedings, he was cooperative and respectful.

### Delay in the Disciplinary Proceedings—9.32(i)

The original complaint in this case was filed in June 2006. The case was not heard until July 2007. In part, the People's action in filing a second complaint and consolidating it with the original complaint occasioned a significant delay in these proceedings.

### *Analysis Under Case Law and ABA Standards*

■ Colorado Supreme Court case law applying ABA *Standards* 4.42 hold suspension is the presumptive sanction when a lawyer causes potential injury by knowingly failing to perform services for a client. *People v. Barber*, 799 P.2d 936 (Colo.1990) (citing ABA *Standard* 4.42 the Colorado Supreme Court suspended a lawyer for six months for missing the statute of limitations). *But See People v. Yaklich*, 744 P.2d 504 (Colo.1987) (one year suspension for neglect of custody support matter and failure to carry out client's objectives).

There are no Colorado cases directly on point dealing with a combination of lack of diligence and a failure to abide by the provisions of Colo. RPC 1.8. Analyzing each of the factors outlined above, the Hearing Board finds that a suspension is appropriate. *See In the Matter of Taylor*, 741 N.E.2d 1239, 1243 (Ind.2001), (where lawyer received an interest in a client's marital property in violation of rule 1.8(a)). In this case, the court specifically found "The *Rules of Professional Conduct* place restrictions on business transactions between lawyers and their clients based on an assumption that the lawyer in such dealings will generally possess, for various reasons, an unfair advantage in bargaining position." Respondent exacerbated this problem by not diligently carrying out the scope and objectives of the representation his client articulated. *See also* Colorado Bar Association Formal Opinion 110 and

American Bar Association Formal Opinion 02–427.

## VI. *CONCLUSION*

One of the primary goals of our disciplinary system is to protect the public from lawyers who potentially pose a danger to them. In this case, Respondent's failure to comply with the provisions of Colo. RPC 1.8 followed by his lack of diligence and competence in pursuing one of his client's primary objectives in the divorce case caused potential and real harm to his client.

There is no question that Mrs. Varner was a difficult client with whom to communicate. Nevertheless, Mrs. Varner's lack of communication does not excuse Respondent's failure to abide by his ethical duties.

In stark contrast to his inadequate efforts to secure Mrs. Varner's benefits in her husband's pension, Respondent demonstrated resolve in collecting his fees. It is not surprising Respondent's swift and successful collection of fees with the simultaneous lack of zeal in securing her husband's pension benefits caused Mrs. Varner client to question Respondent's ethics.

While Respondent had a right to take a deed of trust and promissory note to secure payment of fees from Mrs. Varner, he also had the ethical responsibility to do so properly under Colo. RPC 1.8. Further, Respondent's conduct goes beyond a failure to follow the prescriptive requirements of Colo. RPC 1.8. Respondent caused real and potential injury to his client.

## VII. *ORDER*

It is therefore ORDERED:

1. **ROBERT SCOTT FISHER,** Attorney Registration No. 14996, is hereby **SUSPENDED** from the practice of law in the State of Colorado for a period of **SIX MONTHS, ALL STAYED** upon the successful completion of a two-year period of probation with the condition that he attend and successfully pass the Office of Attorney Regulation Counsel's Ethics School within one year of the date of this order.

2. **ROBERT SCOTT FISHER SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this order. Respondent shall have ten (10) days thereafter to submit a response.