No. 46,530

In the Matter of the Estate of Maude Perkins, a/k/a Maude M. Perkins, Deceased. Edwin D. Morrison, *Appellant,* v. Marlin A. White, Executor of the Estate of Maude Perkins, a/k/a Maude M. Perkins, Governing Body of the Holton Christian Church, Holton, Kansas; Edna Palmer Deceased, Her Heirs, Executors, Administrators and Personal Representatives, *Appellees.*

(504 P. 2d 564)

Opinion filed December 9, 1972.

*Arthur L. Claussen,* of Topeka, argued the cause, and *Edward S. Dunn,* of Holton, was with him on the brief for the appellant.

*James E. Parmiter,* of Holton, argued the cause, and *Marlin A. White,* of Holton, was with him on the brief for the appellees.

The opinion of the court was delivered by

Prager, J.: This is a will contest. The district court after an extensive evidentiary hearing admitted to probate the last will and testament of Maude M. Perkins. The appellant, a nephew of the testatrix, attacks the will on two grounds:

(1) The will was not executed in compliance with the requirements of K. S. A. 59-606.

(2) The testatrix lacked the mental capacity to execute a will at the time the will was executed.

There is no claim made of fraud or undue influence or that the document was not in fact signed by the testatrix and by the two subscribing witnesses, Anna M. Pool and Delores Schlodder. The trial court in its memorandum decision made extensive findings of fact a summary of which is as follows: The testatrix, Maude M. Perkins, died May 14, 1970, at the age of 87 years. She had never married. She left surviving her as her sole heirs, her sister, Edna Palmer, and her nephew, Edwin D. Morrison, who was sometimes referred to as Dale Morrison. Miss Perkins had lived on the family farm in Jackson County, Kansas, with her brother Ray R. Perkins, until his death in March 1962. Prior to 1962 a deed was executed wherein this farm, a quarter section, was conveyed to Ray Perkins, Maude Perkins, and Edwin D. Morrison as joint tenants. On the death of Maude Perkins the title to this land went to Edwin D. Morrison as the surviving joint tenant. After the death of her brother, Ray Perkins, Maude stayed on the farm for a short period and early in 1963 moved to the city of Holton. After living a short period with her sister she moved with her sister to a rest home at Smith Center, Kansas, where she died. In the fall of 1962 Mr. Edward S. Dunn, an attorney at Holton, Kansas, prepared a will for Miss Perkins. This will was offered for probate also. The probate court found this will was properly executed according to law and that at the time of its execution Maude Perkins had testamentary capacity. It further found that the 1965 will, which is involved here, by its terms revoked the 1962 will. In the 1962 will, Maude Perkins, had given $1,000 to her sister, Edna Palmer, with some language about reducing this amount if her estate was diminished in Maude's lifetime. The residue of the estate was left to the nephew, Edwin D. Morrison. This 1962 will was never physically destroyed.

On February 1, 1963, Maude Perkins, filed a voluntary petition for the appointment of a guardian for her person and estate. The reason for her action was that she felt she needed help in handling her business and financial affairs. Mr. Marlin A. White, an attorney at Holton, had known Miss Perkins causally and had visited with her on the street. Miss Perkins spent a lot of time "uptown" on the square in Holton. In August of 1964, she consulted Mr. White con-

cerning a change in her guardian. There was some disagreement about the guardianship. White filed a petition to terminate the guardianship. The trouble was apparently worked out amicably with the result that a different guardian was appointed and the petition to terminate the guardianship was not pressed.

About a week or 10 days prior to June 1, 1965, Maude Perkins consulted Mr. White concerning a will. At that time Mr. White knew of the voluntary guardianship and spent more than the usual time in discussing the matter of the will with her. Upon inquiry by Mr. White, Miss Perkins told him that she had about $20,000 in two financial institutions; that there was a farm in which she had an interest which would go to Dale Morrison on her death and that she had no right to make a will concerning the farm; that her family consisted of her sister, Mrs. Palmer, Mrs. Palmer's two sons, and Dale Morrison, the son of her predeceased sister. Miss Perkins told Mr. White she had made a prior will which had been prepared by Mr. Dunn. She stated that in the prior will she had given Mrs. Palmer $1,000 and the balance to Dale Morrison. She discussed the fact that she did not want to give her sister the full $1,000 if her estate was diminished. She stated she now wanted the Christian Church of Holton to have the balance of her estate to be used for education of ministers but that she did not want them to be able to spend it all at once. She wanted a memorial in her name. Mr. White suggested that Mrs. Palmer be given 5% of her estate and that a trust arrangement be set up for the bequest to the church. These suggestions were agreeable to Miss Perkins.

A day or two before June 1, 1965, Miss Perkins saw Mr. White on the street of Holton and asked him humorously, "Are you ever going to get that will made?" Mr. White told her to come to the office June 1st and that it would be ready. The will was executed on June 1, 1965. On the morning of that day Miss Perkins called Mr. White on the telephone and asked if she could bring a friend to be a witness to the will which Mr. White said would be all right. Miss Perkins called Anna M. Pool, who had known Miss Perkins since 1963, and asked to meet her at the courthouse in Holton, not giving a reason. These two met at the courthouse and there Miss Perkins told Mrs. Pool that she had a will made out and she wanted Mrs. Pool to sign it. They proceeded to Mr. White's office. When Miss Perkins and Mrs. Pool arrived at Mr. White's office he asked Miss Perkins to read the will which she apparently did. He then

read it aloud to her. Miss Perkins asked Mr. White to explain "net income," a phrase used in the will, which was done to her apparent satisfaction. This was done with Mrs. Pool present.

Then Mr. White stepped down the hall and asked Delores Schlodder, who was employed in a doctor's office in the same building, to come in to sign the will. Mrs. Schlodder had on many previous occasions been asked to witness the signing of wills. Mrs. Schlodder along with Mr. White then entered the office room where Miss Perkins and Mrs. Pool were seated. Mr. White introduced Mrs. Schlodder and told Miss Perkins that Mrs. Schlodder would witness her will. Mrs. Schlodder had known Miss Perkins casually prior to that time. Mr. White in the presence of all three ladies then asked Miss Perkins who her heirs were and if she would like to tell Mrs. Schlodder what she was leaving in her will. Miss Perkins answered these questions. Mrs. Schlodder does not recall the specific questions or details. Miss Perkins talked to Mrs. Pool and mentioned leaving money to the Christian Church. Mrs. Pool stated in substance that it was her money to do with as she wanted. Mrs. Pool does not recall that Miss Perkins said anything other than the comment about the money to the Christian Church. Following this Miss Perkins signed the document; Mrs. Pool signed the document as a witness and then Mrs. Schlodder signed the document as a witness. Mrs. Schlodder actually saw Miss Perkins sign the document. Mrs. Pool did not actually see Miss Perkins sign the document because she was seated across the room with her back to the wall. At the time of trial Mrs. Pool was 81 years of age and had an obvious hearing deficiency. The signature of Miss Perkins was affixed to the document prior to that of any of the witnesses. The witnesses saw each other sign the document; they both knew they were witnessing the will of Maude M. Perkins. Maude M. Perkins knew she had signed her will and that Mrs. Schlodder and Mrs. Pool were signing as witnesses to the will. All four parties, Miss Perkins, Mrs. Schlodder, Mrs. Pool and Mr. White, were in the same room during the entire procedure of the execution of the will. They were all within the presence, sight, and hearing of each other. After the execution of the will, Mrs. Schlodder left to return to her work. Miss Perkins then asked Mr. White to keep the will. Mr. White suggested that it could be left with the probate court. Miss Perkins stated that she had left a will with the probate court once and had had trouble getting it out

again and wanted Mr. White to keep it. Mr. White retained possession of the will.

There was a great deal of conflicting testimony in regard to the physical and mental condition of Miss Perkins during the year preceding the execution of the will. In 1964, particularly in the fall of the year, and progressing into the spring of 1965 Maude Perkins was becoming more and more forgetful. She at times could not remember the names of friends of long standing; at times she appeared either to ignore such persons or not to recognize them. She mixed up the names of her nephews and their wives. She would go to a doctor's office and then forget the purpose of her visit or not know where she was. Her clothing and appearance became increasingly disheveled. She was prescribed tranquilizers for her agitation of mind. She repeatedly and frequently went to see her guardian as to her money, inquiring how much she had on hand; she could not remember the amounts so her guardian, a banker, J. B. Patton, wrote them down for her. She feared she would not have enough money to last her. She had cerebral arteriosclerosis. Her doctor Roy Moser, M. D., testified that in his opinion she could not concentrate on a subject for more than a few minutes; he was of the further opinion that on June 1, 1965, as far as going out in the business world, Miss Perkins was incompetent. Her guardian J. B. Patton was of the opinion that Miss Perkins did not comprehend the value of her property, but that she did know her heirs because she spoke repeatedly about Mrs. Palmer and her nephew Dale Morrison. Her former attorney Mr. Edward S. Dunn was of the opinion that Miss Perkins was not mentally competent on June 1, 1965. Her nephew Dale, was of this same opinion. Other lay witnesses were of this same opinion. At the conclusion of the evidence the trial court took the case under advisement.

In its memorandum decision the trial court found the facts substantially as set forth above. It also made conclusions of law to the effect that on June 1, 1965, at the time of the execution of the purported will Maude Perkins was mentally competent to make a will and further that the will was executed in accordance with the requirements of K. S. A. 59-606. The document dated June 1, 1965, was admitted to probate as the last will and testament of Maude M. Perkins, deceased. The appellant, Edwin D. Morrison, filed a motion for a new trial which was argued and submitted to the court. The trial court adhered to its original decision and

the motion for a new trial was overruled. A timely appeal was taken to this court by Edwin D. Morrison.

The first point which appellant has raised on this appeal is that the will was not properly executed in accordance with K. S. A. 59-606 because the witness, Mrs. Pool, did not see the testatrix sign the will, nor did she hear the testatrix acknowledge the same. K. S. A. 59-606 provides as follows:

"Execution and attestation. Every will, except an oral will as provided in section 44 [59-608], shall be in writing, and signed at the end thereof by the party making the same, or by some other person in his presence and by his express direction, and shall be attested and subscribed in the presence of such party by two or more competent witnesses, who saw the testator subscribe or heard him acknowledge the same."

Since the enactment of this statute interpretative decisions have developed certain principles to be followed in applying the statute. They are as follows:

(1) The will of the testator should be carried out if reasonably possible and a substantial compliance with statutory requirements is enough. Slight or trifling departures from technical requirements will not operate to defeat a will. (*Kitchell v. Bridgeman*, 126 Kan. 145, 267 Pac. 26.)

(2) Where a will is offered for probate, the burden of proof in the first instance is upon the proponent to make a prima facie case showing due execution of the will. When such a prima facie showing has been made, the burden shifts to the contestant to overcome that showing by clear, satisfactory and convincing evidence. (*In re Estate of Wallace*, 158 Kan. 633, 149 P. 2d 595; *In re Estate of Wittman*, 161 Kan. 398, 168 P. 2d 541; *In re Estate of Arney*, 174 Kan. 64, 254 P. 2d 314.)

(3) K. S. A. 59-606 does not make it mandatory for a testator to subscribe his signature in the presence of the witnesses or to tell them it is his signature if the will containing the testator's signature is observed by the witnesses and is clearly acknowledged by the testator to be his last will and testament. (*Humphrey v. Wallace*, 169 Kan. 58, 216 P. 2d 781; *Colman v. Lindley, Administrator*, 115 Kan. 802, 224 Pac. 912.)

(4) It is not necessary that the witnesses attest and subscribe their names in the presence of each other. (*Colman v. Lindley, Administrator*, supra.)

(5) The statute does not require the instrument to be read to

the witnesses by the testator and does not require the witnesses to actually know it is a will. (*In re Estate of Koellen*, 162 Kan. 395, 176 P. 2d 544.)

(6) The acknowledgment of the testator need not be formal nor in any set form of words. It may be implied and consist of conscious acts or conduct on the part of the testator. (*In re Estate of Davis*, 168 Kan. 314, 212 P. 2d 343; *Humphrey v. Wallace*, supra.)

The appellant relies primarily on *In re Estate of Weber*, 192 Kan. 258, 387 P. 2d 165. There the deceased, Weber, who was ill signed the will in an automobile parked at the curb of the street beneath a window of a bank where he could be observed at a distance of 8 to 10 feet by three bank employees who saw him sign a document at his place in the automobile. After Weber signed the document it was taken into the bank where the witnesses signed their names. Weber could see the bodies of the witnesses as they subscribed their names to the purported will but could not see the pen or the purported will on the table at the time of the signing. At no time was there any communication between Weber and the witnesses other than their waving to one another. Weber never entered the bank building and never heard anything said in the bank. The witnesses never left the bank and heard no conversation that occurred in Weber's automobile. This court by a four-to-three decision held that under the factual circumstances the proximity between the witnesses and the testator was not sufficient to establish "presence" and therefore there was not a sufficient compliance with K. S. A. 59-606.

When we apply the controlling principles of law discussed above to the factual circumstances of the case at bar, we find a clear compliance with K. S. A. 59-606. Here the undisputed testimony of the subscribing witnesses and of the attorney who drew the will, all of whom were present at the time of the execution of the will, established the following facts: The will was signed by the testatrix Maude M. Perkins and by the two witnesses while all were present in the same room. Both of the witnesses were told in the presence of the testatrix that they were there to witness the signing of Miss Perkins' will. The witness Mrs. Pool was present when Miss Perkins read the will and heard the testatrix and her attorney, Marlin A. White, discuss its provisions. In the presence of the witnesses the testatrix, when asked, stated who her heirs were and stated what she was leaving in her will and to whom

it was going. Mrs. Schlodder actually saw Miss Perkins sign the document. Although Mrs. Pool did not actually see Miss Perkins sign the will because of her position in the room, she knew that Miss Perkins had signed it and heard her discuss the possession of the will with Mr. White after the signing had all been completed. Mrs. Schlodder and Mrs. Pool saw each other sign the will. In view of these facts we find no merit to the first point raised in this appeal. We hold that there was no error in the conclusion of the trial court that the will was executed in accordance with the requirements of K. S. A. 59-606.

As his second point on this appeal the appellant contends that the testatrix Miss Perkins was not competent to make a will because she did not know the nature and extent of her property or who were the natural objects of her bounty. There have been many cases involving the issue of testamentary capacity of a testator. Those cases have developed guiding principles to be applied where the issue of testamentary capacity arises. The principles briefly stated are as follows:

(1) Where the mental capacity of the testator to make a will is the issue, the supreme court on review is only concerned with the inquiry whether there was substantial competent evidence to support the trial court's finding of capacity. It does not compare or weigh testimony. (*In re Estate of Smith,* 168 Kan. 210, 212 P. 2d 322; *In re Estate of Hall,* 165 Kan. 465, 195 P. 2d 612; *In re Estate of Bernatzki,* 204 Kan. 131, 460 P. 2d 527.)

(2) In an action to avoid a will on the grounds of incapacity of the testator, when it is shown that a will has been executed in accordance with the formalities required by law, the burden is upon the will contestant and he must produce evidence to support his position. (*Rich v. Bowker,* 25 Kan. 7; *In re Estate of Smith,* supra; *In re Estate of Walter,* 167 Kan. 627, 208 P. 2d 262.)

(3) The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be feeble in mind and decrepit in body. (*In re Estate of Hall,* supra; *In re Estate of Smith,* supra; *Klose v. Collins,* 137 Kan. 321, 20 P. 2d 494; *Barnhill*

*v. Miller,* 114 Kan. 73, 217 Pac. 274; *Anderson v. Anderson,* 147 Kan. 273, 76 P. 2d 825; *In re Estate of Bernatzki,* supra.)

(4) The time when a will is made is the time of primary importance to be considered in estimating testamentary capacity. Evidence of capacity or lack of capacity before or after that time serves only as an aid to determine the primary question. (*In re Estate of Hall,* supra.)

(5) The mere fact one is under guardianship does not necessarily deprive him of the power to make a will. (*In re Estate of Hall,* supra.)

In this case the trial court made extensive findings of fact which are discussed heretofore. These findings on the issue of testamentary capacity are supported by substantial competent evidence. There was ample evidence for the trial court to go either way on that issue. After thoughtful consideration the able trial judge found that the testatrix had the capacity to make a will on June 1, 1965. We cannot find error in his ultimate decision.

The judgment is affirmed.