(934 P.2d 144)
No. 73,975
No. 74,669

In the Matter of the Estate of ALTA E. OLIVER, Deceased. LENARD MILLER and CHARLENE MILLER, *Appellants*, v. VELDA FISCHER, Executor of the Estate of ALTA E. OLIVER, *Appellee*.

Opinion filed February 21, 1997.

*Jerry L. Harrison*, of Noah & Harrison, P.A., of Beloit, for appellants.

*Rod Ludwig*, of Miller & Ludwig, of Beloit, for appellee.

Before GERNON, P.J., WAHL, S.J., and DAVID W. KENNEDY, District Judge, assigned.

GERNON, J.: This is a will contest case. The contestants, Lenard and Charlene Miller, appeal the trial court's decision to admit the will of Alta E. Oliver into probate.

Oliver died in 1993 at the age of 93, leaving an estate of approximately $400,000. She was survived by a sister and several nieces and nephews.

The Millers were friends with Oliver. From 1978 until her death, Oliver wrote several different wills, leaving the Millers as beneficiaries in each, but in varying degrees.

In 1985, the Millers took Oliver to her attorney, Raymond Stein, and she executed a will which made the Millers the principal beneficiaries.

In 1988, a guardian and a conservator were appointed for Oliver. She also entered a nursing home that fall.

In November 1988, several of Oliver's relatives, including her sister, visited her and tape recorded their conversation with her. The substance of the conversation was to advise Oliver that she had given Lenard Miller control of her estate and to urge her to see her lawyer to check her estate plan.

One nephew, Charles Albert, subsequently asked Guy Steier, Oliver's guardian ad litem, to meet with Oliver because he felt she wanted more input into her personal affairs. Steier met with Oliver in January 1989. Steier testified that Oliver seemed surprised she had so much money in various accounts. He testified that at that

time, she expressed reservations about the amounts the Millers would receive under the will. She stated, according to Steier, that she wanted more input as to how her affairs were being handled.

Steier contacted the local mental health center and requested an evaluation of Oliver. A hearing on a petition for restoration of capacity was held, at which time the results of the evaluation were presented. The magistrate judge found that Oliver was a disabled person and ordered the guardianship and conservatorship to continue. The magistrate made no ruling as to her testamentary capacity. Oliver's niece, Charlene Rupe, was appointed guardian, and a bank was appointed as conservator.

In June 1989, Rupe and two other nieces took Oliver to the bank where her certificates of deposit naming the Millers as the payable on death recipients were located. A bank teller, Peg Kenningsman, testified that Oliver informed her she wanted to change the beneficiaries on her certificates of deposit. Kenningsman testified that Oliver did not talk with her nieces while at the bank and never wavered in her request. Kenningsman testified that Oliver appeared to know what she was doing.

That same day, the nieces took Oliver to see Steier. Steier met with Oliver in private. The 1985 will was reviewed in detail, and Oliver, according to Steier, made very specific and knowledgeable changes to the will.

Two days later, Steier again met with Oliver. They reviewed the will, and Oliver made a change in one of the clauses.

On June 30, 1989, Steier and two of his employees, Janet Holway and Marilyn Huffman, went to see Oliver at the nursing home with the final draft of the will. When they arrived, Oliver was playing cards and Steier noted that her cards were properly organized and she was playing the correct meld. After she finished playing the hand, they went to her room and reviewed the 1985 will and the new one. Steier stated that Oliver knew her family, her land, and where her bank certificates and accounts were generally located, but she was not sure how much money was in the accounts. When Steier suggested $190,000, Oliver was still not sure about the amount but stated that she trusted him. Oliver executed the will

in the presence of Steier, Holway, and Huffman. Steier and Holway signed as witnesses, and Huffman notarized the document.

Steier testified that in his opinion, Oliver possessed testamentary capacity at that time and was not under undue influence. Holway also testified that in her opinion, Oliver knew who her relatives were, what her assets were, and why they were present in her room on June 30, 1989.

The 1989 will was submitted for probate. The Millers contested the validity of the 1989 will, claiming it was the product of undue influence and that Oliver lacked testamentary capacity at the time the will was executed.

### Can a conservatee make testamentary decisions?

The Millers first argue that since Oliver was a disabled person under K.S.A. 59-3002(a) and had a guardian and conservator involuntarily appointed for her, she lacked the required capacity to execute the 1989 will and to change the beneficiaries on her payable on death certificates of deposit. They maintain the trial court erred in finding that Oliver was competent to execute her 1989 will and make the changes to her certificates of deposit because an involuntary conservatee cannot make testamentary dispositions.

The Millers' contention raises a question of law over which this court has unlimited review. See *Hillman v. Colonial Penn Ins. Co.*, 19 Kan. App. 2d 375, 376, 869 P.2d 248, *rev. denied* 255 Kan. 1001 (1994).

While it is true that most of our decisions on this issue have arisen in the context of a voluntary conservatorship, see, *e.g.*, *Campbell v. Black*, 17 Kan. App. 2d 799, 844 P.2d 759 (1993), our courts continue to adhere to the principle that being under a guardianship or conservatorship does not prevent one from making testamentary dispositions. As noted in *Citizens State Bank & Trust Co. v. Nolte*, 226 Kan. 443, 449, 601 P.2d 1110 (1979), the conservator's purpose "is to manage the estate during the conservatee's lifetime. It is not his function, nor that of the probate court supervising the conservatorship, to control disposition of the conservatee's property after death."

In *In re Estate of Raney*, 247 Kan. 359, 799 P.2d 986 (1990), the decedent's children sought and obtained a conservatorship for him against his wishes. The decedent believed his children imposed the conservatorship in order to preserve his estate for themselves and subsequently executed a will while under the conservatorship. The trial court refused to admit the will to probate, finding that the decedent lacked testamentary capacity to make the will because he suffered from insane delusions. The Supreme Court reversed on the basis that the trial court's finding was not supported by the evidence. 247 Kan. at 375. In reaching its holding, the court noted:

"The trial court recognized that being under a guardianship and conservatorship does not necessarily deprive one of the power to make a will. Incompetency to transact business is not the equivalent of insanity and does not mean that the testator lacks testamentary capacity. Previously, this court concluded that an aged person who was ' "feeble-minded and incapable of managing his affairs" ' and who needed a guardian could, three weeks later, be competent to make a will. *In re Estate of Hall*, 165 Kan. 465, 469, 195 P.2d 612 (1948) (quoting *Mingle v. Hubbard*, 131 Kan. 844, 293 Pac. 513 [1930] ). In *Hall*, the court stated: 'It is practically a universal rule that the mere fact that one is under guardianship does not deprive him of the power to make a will.' 165 Kan. at 469 (citing Annot., 8 A.L.R. 1375)." 247 Kan. at 367-68.

We conclude that a conservatee, whether voluntary or involuntary, clearly retains the right to decide how his or her property is to be distributed upon death. See *In re Estate of Perkins*, 210 Kan. 619, 626-27, 504 P.2d 564 (1972); *In re Estate of Briley*, 16 Kan. App. 2d 546, 549, 825 P.2d 1181 (1992). This right includes the power to change beneficiaries on payable on death accounts as well as make wills. See *In re Estate of Raney*, 247 Kan. at 367-68; *Campbell v. Black*, 17 Kan. App. 2d at 802-03. "As long as the requisite mental capacity exists, a person has the power to dispose of the property as he wishes, and this power should not be interfered with by the court." *In re Estate of Raney*, 247 Kan. at 367. Consequently, if, as in this case, Oliver possessed testamentary capacity at the time she executed her will and made the changes to her payable on death certificates of deposit, the distributions are valid.

### Burden of Proof

The Millers next assert that there is a presumption of testamentary incapacity for any ward or conservatee. We disagree.

It is well established in Kansas that once it has been shown that "a will has been executed in accordance with the formalities required by law, the burden is upon the will contestant and he must produce evidence to support his position." *In re Estate of Perkins*, 210 Kan. at 626.

The cases cited by the Millers involve individuals who have been adjudicated mentally incompetent or insane. Here, the record does not support an assertion that Oliver's mental condition was so diminished as to render her insane or mentally incompetent.

Other jurisdictions hold the fact that an individual has been adjudicated incompetent at a guardian proceeding does not mean he or she cannot execute a will. These courts note that this fact is merely evidence to be considered when determining testamentary capacity and the proponent does not carry a higher burden of proof on this issue. See, *e.g.*, *Paskvan v. Mesich*, 455 P.2d 229, 238-39 (Alaska 1969); *In re Estate of Basich*, 79 Ill. App. 3d 997, 1001, 398 N.E.2d 1182 (1979); see also Annot., 89 A.L.R. 2d 1120. Other courts point out that a guardianship and conservatorship can be based on a variety of reasons other than for complete mental incompetency, such as age, which do not necessarily affect an individual's testamentary capacity. See, *e.g.*, *Estate of Dopkins*, 34 Cal. 2d 568, 578, 212 P.2d 886 (1949); *In re Bottger's Estate*, 14 Wash. 2d 676, 697, 129 P.2d 518 (1942); see also Annot., 89 A.L.R. 2d 1120, 1130.

Based on the above reasoning, we conclude the burden of proof on the issue of testamentary capacity does not change in those instances where a testator is involuntarily appointed a conservator or guardian.

## Testamentary Capacity

The Millers contend the trial court's findings that Oliver possessed testamentary capacity when she changed her payable on death certificates and when she executed her will are not supported by the evidence.

When reviewing the trial court's findings, this court must determine whether substantial competent evidence exists to support the

court's findings and will not reweigh conflicting evidence. *In re Estate of Bolinder*, 19 Kan. App. 2d 72, 74, 864 P.2d 228, *rev. denied* 254 Kan. 1007 (1994).

A testator must have testamentary capacity to make a will. In Kansas, the requirements for determining testamentary capacity are well settled:

"It is the established rule in Kansas, the deceased possesses testamentary capacity if, on the date he executes the instrument which determines the manner in which the property will be disposed after death, he knows and understands the nature and extent of that property, has an intelligent understanding concerning the disposition he desires to make of it, realizes who his relatives are and the natural objects of his bounty, and comprehends the nature of the claims of those whom he desires to include and exclude in and from participation in his worldly effects after he has no further need for them." *In re Estate of Ziegelmeier*, 224 Kan. 617, 621, 585 P.2d 974 (1978).

See *In re Estate of Raney*, 247 Kan. at 367; *In re Estate of Bolinder*, 19 Kan. App. 2d at 75. The critical time in determining testamentary capacity is when the will is made and executed. All other evidence concerning the testator's mental capacity before or after the time of execution is only an aid in deciding the issue. *In re Estate of Barnes*, 218 Kan. 275, 281, 543 P.2d 1004 (1975).

"The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be feeble in mind and decrepit in body." *In re Estate of Perkins*, 210 Kan. at 626.

The Millers refer to various instances before and after the dates in question as support for their contention that Oliver lacked testamentary capacity. They further point out that Oliver suffered from degenerative dementia and did not know the exact amount of money in her bank accounts at the time she executed her will.

The mere fact that a person suffers from senile dementia does not mean that person lacks testamentary capacity. *In re Estate of Brown*, 230 Kan. 726, 730, 640 P.2d 1250 (1982). Here, Steier, the attorney who drafted the will, and two of his employees were present when Oliver executed the will. Steier testified that Oliver re-

viewed the will before signing it and knew to whom she wanted her property to go at her death. While Oliver was not positive of the exact amount of her cash assets, she listed her relatives and extensively discussed her personal and real property with Steier. It is apparent from Steier's and Holway's testimony that Oliver knew the general nature of her property and how she wanted it distributed when she signed the will.

Under the circumstances in this case, the trial court's findings that Oliver had testamentary capacity to make the will and to make changes to her certificates of deposit are supported by substantial competent evidence.

## Undue Influence

The Millers contend that Oliver's decisions concerning the disposition of her property were the result of undue influence and that the trial court erred when it found no undue influence.

Once the proponent has presented a prima facie case of the proper execution of the will, the burden of proof shifts to the contestant alleging undue influence to overcome that showing by clear, satisfactory, and convincing evidence. *In re Estate of Bennett*, 19 Kan. App. 2d 154, 165, 865 P.2d 1062 (1993), *rev. denied* 254 Kan. 1007 (1994).

However, a presumption of undue influence arises if the beneficiary of the will is in a confidential or fiduciary relationship with the testator and suspicious circumstances exist. 19 Kan. App. 2d at 169. The courts have refused to provide an exact definition for these factors and state that whether they exist depends upon the particular facts and circumstances of each case. 19 Kan. App. 2d at 167-68, 170.

The trial court found that Charlene Rupe, as Oliver's guardian, was the only relative or beneficiary under her will standing in a fiduciary relationship with Oliver. The court further found that the series of alleged "suspicious circumstances" were not, in fact, suspicious, especially in light of the extensive independent advice given by Steier to Oliver. The court concluded that the Millers failed to establish a presumption of undue influence and, thus, the burden of proof did not shift to the proponents of the 1989 will.

Here, the trial court's finding was a negative finding. A negative finding means the party with the burden of proof failed to meet that burden. *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567-68, 770 P.2d 466 (1989). An appellate court will not disturb such a finding "absent proof of an arbitrary disregard of undisputed evidence, or some extrinsic circumstance such as bias, passion, or prejudice." *Duncan v. City of Osage City*, 13 Kan. App. 2d 364, 369, 770 P.2d 843, *rev. denied* 245 Kan. 783 (1989). " 'An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.' " *Mohr v. State Bank of Stanley*, 244 Kan. at 568 (quoting *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 [1976]).

In *In re Estate of Ziegelmeier*, 224 Kan. at 622, the court defined undue influence as follows:

"Generally, undue influence or fraud, to invalidate a will, must amount to coercion, compulsion or constraint which destroys the testator's free agency, and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own, and it must be brought to bear directly on the testamentary act. [Citations omitted.] Of course, the burden of proof is on the party claiming undue influence. [Citation omitted.] Legitimate influence is not improper; that is, influence obtained by kindness and affection will not be regarded as undue."

" '[H]uman desire, motive and opportunity to exercise such influence will not alone authorize the inference that undue influence was in fact exercised. Neither will suspicion or the possibility of their having induced the making of the will favorable to them be enough to justify a finding of undue influence.' " *In re Estate of Brown*, 230 Kan. at 731-32 (quoting *Klose v. Collins*, 137 Kan. 321, 326, 20 P.2d 494 [1933]).

Our examination of the specific claims made by the Millers leads us to the same conclusion as that of the trial judge.

Affirmed.