NOT DESIGNATED FOR PUBLICATION

No. 127,011

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of MELITTA BROWNING.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed July 11, 2025. Affirmed.

*Benjamin J. Rioux*, of Leavenworth, for appellant.

*Joe B. Kobs*, of Leavenworth, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: With our common law heritage in America, wills have for centuries been used after death to dispose of our property, both real and personal. In the law of probate, wills are considered to be ambulatory; they walk along with the testator—the person signing the will—while they are alive. After death, a will becomes binding, and the testator's wishes as expressed in that will guide a court in its disposition of the testator's estate. Often testators will make several wills during their lifetime. This is why the date of a will is important. Usually, the last will controls. That principle is displayed in this appeal.

This appeal is a will contest. Donna Browning appeals the admission of her mother's will to probate. She claims that her mother, Melitta Browning, did not have testamentary capacity when she executed a will in June 2018. Donna also claims that when the June will was signed, Melitta neither knew the nature and extent of her

1

property, nor did she know who the natural objects of her bounty were, nor what disposition she was making when she signed this will. Donna asks us to reverse the district court's order admitting the will in probate.

After reviewing the record, we find that there was substantial competent evidence to support the district court's ruling. We find no legal errors. Therefore, we affirm.

*A will signed in February is then revoked and replaced in June.*

On February 9, 2018, Melitta Browning executed a last will and testament leaving her entire estate—in equal shares—to her five children:  Donna Browning, Fred Browning, Edith Schmidt, Gerda Ayala-Pagan, and Brenda Miller. Then, on June 28, 2018, Melitta executed a new will that disinherited Donna. Melitta died in July 2022. Carlos, Gerda's son and Melitta's grandson, drafted both the February 2018 and the June 2018 will.

 In December 2022, Carlos sought to probate Melitta's June 28, 2018, will. In January 2023, Donna filed written defenses to the petition for probate denying Carlos' claim that the June 28, 2018, will was Melitta's last will and testament. Donna also filed a petition for probate of the will dated February 9, 2018.

At the hearing on the petitions to admit the competing wills to probate, four witnesses testified:  Tia Crail, who witnessed Melitta's execution of her June 2018 will; Carlos; Donna; and Brenda.

Crail testified that while she was working at Exchange Bank and Trust, someone told her Melitta needed to sign her will. She could not recall if Melitta or someone else told her about the will signing. The will signing occurred at Crail's supervisor's desk in the lobby of the bank. The individuals present for the signing were Crail; Crail's supervisor, Shirley Lowe; Crail's coworker, Janet Treft; and Melitta.

2

None of Melitta's family members were present. Crail watched Melitta sign the will, after which Crail and Treft signed the will as Lowe watched. Crail did not recall Melitta discussing anything about the will that day. Crail saw Melitta speak with Lowe at Lowe's desk, but she did not hear their conversation. Crail did not know Melitta personally. She had met Melitta before as a bank customer but knew nothing about her.

Donna lived with Melitta from February 2018 to May 2018. For the preceding 10 years, Donna had assisted her mother and father with their care and daily needs, including attending doctor's appointments, grocery shopping, house chores, and visiting. After Donna's father passed away, Donna and her daughter, Mikayla Haskins-Koch, moved in with Melitta after Melitta's doctor recommended that she not live alone; Melitta had been diagnosed with dementia in 2014. Gerda and Brenda also visited occasionally.

Donna testified that when Carlos drafted the February 2018 will, she was in the room along with Melitta. Carlos reviewed the will with Melitta "little paragraphs at a time." While reviewing the will, Melitta "made a point of asking if all her children are in this [w]ill." Donna was not present during either the drafting or execution of the June 2018 will.

According to Donna, when she initially moved in with Melitta, they "always got along." But Melitta eventually became "hostile" and "violent" toward Donna, leading to a "hateful, noncooperative" living environment. Donna observed memory lapses from Melitta during this time, including Melitta's inability to remember dates, certain events, and appointments. Melitta would also leave the stove turned on and had trouble remembering if she took her medications. Donna testified that Melitta's behavior "jumped highs to lows" and was particularly bad at night.

On April 30, 2018, Melitta signed a transfer on death deed giving her house to Donna. Donna testified that during this time, Melitta was sometimes, though not always, "lucid." Donna claimed her receipt of her parents' house had been a years-long conversation with her parents and siblings. When asked whether she believed Melitta "was able to make decisions with regard

3

to her affairs" in April 2018, Donna replied, "Not to the full extent, no." But Donna stated that she accompanied Melitta to the deeds office where Melitta signed the deed.

Donna and Melitta had a falling out on May 17, 2018. That day, Mikayla called Donna "all hysterical, crying." Mikayla told Donna that Melitta "was throwing utensils at [her]. Threw all the food out of the refrigerator, threw it on the floor. Said I don't want any of this 'cause [Donna] purchased it." Melitta was "cussing out" Mikayla and she could not calm Melitta down.

Brenda also testified about the May 17, 2018, incident. That day, Savannah Parker, Donna's oldest daughter, called her saying Melitta "was out of control and that they were going to commit her." During that call, Savannah told Brenda she had called the police. Brenda left work and went to Melitta's house, where police later showed up.

In a police report on this incident, Melitta stated she was "angry" about Donna living with her. Melitta told police that "Donna had been living there for free and not contributing to the household. That Donna does not speak to her respectfully. That she wants Donna to leave the house." The report stated that police then explained to Melitta how to evict Donna. Donna told police Melitta was "upset" because none of her children called her on Mother's Day and Melitta took out her frustration on Donna.

Donna testified that she moved out in May 2018 after she "was told to leave." Brenda then lived with Melitta. Brenda testified that after she moved in with Melitta, Melitta did not have any violent outbursts. After moving out, Donna periodically called Melitta. Donna claimed Brenda denied her requests to visit Melitta. Brenda testified that she never disallowed Donna from visiting Melitta. Brenda's only condition on visits was that they could not happen at Melitta's house. Brenda testified that Melitta decided on her own that she did not want to see Donna. Brenda claimed this was because Donna had stolen things from Melitta and Brenda thought a neutral visiting place would be best.

4

Carlos testified that he received power of attorney for Melitta in January 2018. In this role, after discussing with Melitta beforehand, he used funds from Melitta's bank account to pay for renovations to Melitta's home to accommodate her physical needs. He and Melitta also discussed a purchase of plane tickets so Melitta could take her family to Germany. Melitta had wanted to travel back to Germany with her husband, but her husband passed away before they could do so. After her husband's passing, Melitta decided to take her children to Germany rather than make the trip by herself.

Brenda testified that she would be at Melitta's home when workers arrived to do the home renovations. A report by WellSky, a home health care provider, dated April 12, 2019, included notes of discussions with Melitta about the plane ticket purchase and the home renovations. Thus, the record shows the plane ticket and renovation expenses occurred sometime between May 2018 and April 2019. At some point, Carlos was also appointed as Melitta's fiduciary when she received a pension from the Department of Veterans Affairs. It is not clear when this appointment occurred. Carlos did not testify about the will drafting process for Melitta's June 2018 will.

*The court admitted the June 2018 will to probate.*

The court took time to explain its ruling, giving its reasons. In its ruling admitting the June 2018 will to probate, the district court noted the police report from the May 2018 incident and adopted Brenda's account of that incident as its finding of fact.

The district court also noted the WellSky document detailing a discussion with Melitta on April 12, 2019. The document contained statements by Melitta acknowledging that "her memory is not so good" but she could still "make her own decisions" and believed Donna was "trying to stir up trouble" because Melitta had stopped giving her money. Melitta said she "helped [Donna] for years through multiple husbands" and believed there was "something wrong" with Donna.

After Melitta's husband passed away, Melitta discovered that her husband had been giving Donna $135 every month "on top of all of the other things that they did for her." Melitta claimed she had kicked Donna out in May 2018 "because she was stealing money and she was fighting with [Melitta]." Melitta stated she did not want to have contact with Donna anymore. The district court found that the will was properly executed. The court found that Donna absence from Melitta's will did not show that Melitta could not appreciate who her heirs were.

The court stated that it had drawn inferences about Melitta's testamentary capacity based on Crail's testimony. The court explained that Crail knew Melitta as a customer, had spoken to Melitta before, and testified that "there wasn't anything unusual that caught her attention" when Melitta executed her June 2018 will. Based on that testimony, the court found that "it did not appear that there were any issues or any concerns about [Melitta's] lack of understanding as to what she was signing or what was going on, on June 28 . . . of 2018."

The court concluded that Carlos had shown a prima facie case of testamentary capacity, finding "there was nothing to indicate the contrary" and inferring from Crail's testimony that Melitta "was of sound mind and majority" when she executed the June 2018 will. The court then granted Carlos' petition for probate of Melitta's June 2018 will.

*The law that guides us is well settled.*

Caselaw has created an order of proof in will contests. When a party contests a will, the proponent of the will must present a prima facie case of the will's validity. This requires the proponent to show that the testator had testamentary capacity and that the will execution followed statutory requirements. Once the proponent makes a prima facie showing of the will's validity, the burden shifts to the opponent to prove that the will was invalid by clear and convincing evidence. *Cresto v. Cresto*, 302 Kan. 820, 831, 358 P.3d 831 (2015). "Prima facie evidence is evidence sufficient to sustain a verdict in favor of the issue it supports, even though

it may be contradicted by other evidence." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, Syl. ¶ 10, 216 P.3d 170 (2009). Applying these principles here, this means Carlos had the burden to make a prima facie case of the validity of the June will. If that was accomplished then the burden shifted to Donna to prove the June will invalid.

Over the years, cases have established what is required to admit a will. For example, in *In re Estate of Moore*, 310 Kan. 557, 573, 448 P.3d 425 (2019), our Supreme Court explained that "a basic understanding of the property at issue and how the testator wishes to dispose of it" is necessary to establish testamentary capacity, observing:

> "'The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be feeble in mind and decrepit in body.'"

Timing is important here. Courts are chiefly concerned with whether the testator had testamentary capacity at the time of will execution. "Evidence of capacity or lack of capacity before or after that time serves as only an aid in determining whether the testator had capacity at the time the will was executed." *In re Estate of Farr*, 274 Kan. 51, 64, 49 P.3d 415 (2002). The fact that the testator suffered from cognitive impairments, such as dementia, is not dispositive in determining whether testamentary capacity exists. 274 Kan. at 65.

*Donna claims Melitta lacked testamentary capacity when the June will was signed.*

Donna argues that Carlos failed to make a prima facie showing that Melitta had testamentary capacity. She claims there was no evidence that Melitta knew and understood the nature and extent of her property.

7

Carlos responds that the district court drew reasonable inferences from the evidence in finding that Melitta had testamentary capacity. He points to the police report from the May 2018 incident and the WellSky document as evidence from both before and after the June 2018 will to establish a prima facie case of testamentary capacity.

Donna relies on *In re Estate of Fearn*, No. 109,862, 2013 WL 6726122 (Kan. App. 2013) (unpublished opinion), as authority. There, Gene, the testator, approached his attorney about changing his will to disinherit his children, citing his anger with his son, Kenneth. Gene told his attorney he wanted his estate to go to his wife, or if his wife predeceased him, to two charities. Before the attorney prepared a new will, Gene's wife was diagnosed with cancer. Therefore, Gene had his daughter, O'Rourke, prepare a new will, instructing O'Rourke to make certain changes. After preparing the will, O'Rourke drove Gene and his wife to the bank to execute the will. Gene talked to a bank employee about his will for 5-10 minutes, after which Gene and two other employees executed the will. At a hearing following Kenneth's objection to Gene's new will, O'Rourke testified about Gene's appointment with his attorney and her preparation of the will. The bank employees testified that they had known Gene for seven years as a bank customer and that Gene "did not appear to be intoxicated or under the influence of drugs and did not exhibit any behavior which would lead one to believe that he did not want to sign the will." 2013 WL 6726122, at *2. The district court found O'Rourke failed to present a prima facie case of testamentary capacity.

When O'Rourke appealed, Kenneth argued in part that O'Rourke provided no evidence that Gene knew the nature and extent of his property. The *Fearn* panel agreed, finding no testimony indicating that Fearn discussed any of his property he was devising. The panel explained that even if the bank employees could not provide this testimony, O'Rourke, as drafter of the will, should have given testimony showing that Gene understood the nature and extent of his property. Because O'Rourke failed to do so, the panel affirmed the district court's finding that Gene lacked testamentary capacity regarding the nature and extent of his property. 2013 WL 6726122, *6.

8

In reply, Carlos notes that *Fearn* is an unpublished opinion. He also contends that while the evidence in *Fearn* did not permit an inference of testamentary capacity, this record is more extensive and allows such an inference.

The testimony in *Fearn* showed more evidence of the testator's capacity on the day of execution than the testimony in this case. In *Fearn*, the will drafter testified that the testator instructed her in drafting the will. A witness to that will also testified that the testator did not show signs that he was executing the will involuntarily. Here, Carlos did not testify in any detail about the will drafting process. He only testified that he drafted both of Melitta's wills. Crail did not discuss the will with Melitta on the day of execution and did not testify about Melitta's mental state or capacity at the time. But the district court here reached the opposite conclusion to the district court in *Fearn*. While the *Fearn* panel was determining whether substantial competent evidence supported a finding of no testamentary capacity, this case presents the opposite question of whether there was substantial competent evidence to find that Melitta had testamentary capacity.

Carlos points to *In re Estate of Brown*, 230 Kan. 726, 640 P.2d 1250 (1982), as an example of reasonable inferences a district court may draw in finding that a testator had testamentary capacity.

Brown was diagnosed with arteriosclerosis, which caused confusion, memory lapses, and disorientation among other symptoms. After Brown moved into a nursing home, he encountered his former attorney, though he did not recognize the attorney. Brown later met with an attorney to discuss his will. Brown explained how he wanted his property distributed and, after the attorney read the will back to him, Brown stated, "'That's what I want.'" *Brown*, 230 Kan. at 728. The attorney did not ask Brown if he knew of relatives other than those listed in the will, though the attorney testified that Brown "knew what he wanted to do with his property and the natural objects of his bounty were clear in his mind." 230 Kan. at 728. Notes from Brown's nurse indicated Brown was "confused and depressed" around the time he executed his will. 230 Kan.

9

at 727. But Brown was on medication making him more "alert" and his physician testified that during the relevant period, Brown "'seemed confused at times, but generally was oriented and mentally stable, clear and rational.'" 230 Kan. at 727. The district court found that Brown lacked testamentary capacity and that Brown's niece exerted undue influence on Brown.

The Supreme Court reversed the district court's finding that Brown lacked testamentary capacity, finding it was not supported by substantial competent evidence. The court found "the only evidence regarding [Brown's] capacity on the actual day the will was made tends to show he was competent." 230 Kan. at 731. The court acknowledged that Brown's attorney never asked Brown who his heirs were but pointed to testimony by Brown's attorney and other witnesses opining that Brown "had the capacity to make an intelligent decision regarding the disposition of his property." 230 Kan. at 731. The court ultimately affirmed the district court's conclusion that Brown's niece exercised undue influence on Brown. 230 Kan. at 732.

When it made its ruling, the Supreme Court drew inferences from the testimony in *Brown* to find that Brown had testamentary capacity. Similarly, the evidence here showed that in the months before and after the June 2018 will execution, Melitta was aware of the money she owned and could decide how to allocate that money. Additionally, shortly before the June 2018 will, Melitta had executed a transfer on death deed giving her house to Donna. The police report and the WellSky document showed that Melitta believed Donna was stealing money from her and that Melitta was aware of how her assets had been used to help Donna. In *Brown,* as here, the testators had medical diagnoses calling their mental capacity into question. But in both cases, the evidence showed that the testators were clear-minded enough to make decisions about their property. Thus, following the holding in *Brown,* we hold that there is enough evidence here to draw a reasonable inference of testamentary capacity.

*Did Melitta know what she owned when she signed the June will?*

Several cases guide us on this point. Kansas courts have not required a precise accounting by the testator of each piece of property being devised. In *In re Estate of Kern*, 239 Kan. 8, 716

P.2d 528 (1986), evidence showed that Kern generally described her property to her attorney, comprising "120 acres of land . . . her mobile home and personal effects, a checking account, and a 'bond' in the bank." 239 Kan. at 11. The Supreme Court found there was "no question that [Kern] knew the nature and extent of her property." 239 Kan. at 15. See also *Farr*, 274 Kan. at 65.

Then, in *In re Estate of Oliver*, 23 Kan. App. 2d 510, 934 P.2d 144 (1997), the will drafter testified that Oliver "was not positive of the exact amount of her cash assets," but she "extensively discussed her personal and real property" with the will drafter. 23 Kan. App. 2d at 517. The *Oliver* panel found this evidence satisfactory to establish testamentary capacity. 23 Kan. App. 2d at 517.

Thus, courts have not required the testator to always know the nature and extent of their property. In *In re Estate of Cox*, No. 74,168, 1996 WL 35070242, at *5 (Kan. App. 1996) (unpublished opinion), another panel of this court found that Cox understood the nature and extent of his property "prior to and shortly after executing his will" where Cox "told several people of his various bank accounts and stock interests," knew the source of the money in his accounts, and knew he owned the house he lived in.

Our Supreme Court has also permitted "a reasonable inference" of testamentary capacity to derive from testimony where the will drafter has testified that the testator instructed what changes to make to the will while referring to the names of devisees and the property being devised. *In re Regle's Estate*, 170 Kan. 558, 560, 228 P.2d 722 (1951).

Evidence here suggests that Melitta understood the nature and extent of her property. Donna testified that her receipt of Melitta's house through the April 2018 transfer on death deed was a years-long conversation among her siblings and Melitta. This shows that Melitta was aware that she owned her house at the time. Additionally, the WellSky document suggested that in the months before and after the June 2018 will execution, Melitta understood what money she

11

owned and knew how she wanted to allocate it. This case is complicated by Carlos' lack of testimony about the will drafting process and the lack of detail in Crail's testimony regarding the execution process. But the WellSky document showed that Melitta discussed her monetary assets with Carlos in approving expenditures for the home renovations and the plane tickets to Germany. The WellSky document also showed that Melitta was "comfortable" with Carlos in his role as power of attorney. Accordingly, we hold that the district court's finding of a prima facie showing that Melitta knew the nature and extent of her property was supported by substantial competent evidence.

*Did Melitta know who the "natural objects of her bounty" were?*

Donna contends there was no evidence that Melitta knew who her heirs were. She submits that there was no evidence Melitta knew of Mona Lisa Harrison, her daughter who was adopted away. Donna also asserts there was no evidence that Melitta knew who Edith or Fred were at the time she executed the June 2018 will. Carlos responds that because Mona Lisa was adopted away, the effects of adoption are controlled by K.S.A. 59-2118, which states that the rights of birth parents to inherit from or through the adopted person end when the adoption occurs.

We question the significance of this argument. Mona Lisa's adoption occurred when Melitta lived in Germany before moving to the United States. The testimony in this case showed that Brenda was unaware of Mona Lisa's whereabouts until Mona Lisa contacted her after Melitta's death. There was no evidence that Melitta or anyone else in the family had contact with Mona Lisa before she contacted Brenda.

Carlos is correct that K.S.A. 59-2118(b) terminates the right of a birth parent to inherit from a biological child once an adoption occurs. But K.S.A. 59-2118(b) also states:  "An

12

adoption shall not terminate the right of the child to inherit from or through the birth parent." But the law does not end there. After the Legislature included this language in K.S.A. 59-2118(b) in 1993, another panel of this court interpreted the language as an explicit statement of the Legislature's understanding that the law had previously allowed adopted children to inherit from their biological parents. *In re Estate of Hinderliter*, 20 Kan. App. 2d 29, 32, 882 P.2d 1001 (1994). Therefore, Carlos' argument that adopted children cannot inherit from their biological parents fails.

While Mona Lisa's adoption does not extinguish her status as Melitta's heir under Kansas law, courts have not required a strict recitation of a testator's heirs to find that the testator understood their natural heirs. In *Kern*, evidence showed that Kern knew her brothers and sisters whom she wanted to include in her will. But she did not recall the names of certain nieces and nephews. The Supreme Court found that there was no evidence that Kern had any contact with or had met her nieces and nephews. Therefore, the Court found Kern's failure to recall their names and include them in the will insufficient to show a lack of testamentary capacity. 239 Kan. at 15-16.

Then, in *In re Estate of Bryan*, No. 103,655, 2011 WL 2535005 (Kan. App. 2011) (unpublished opinion), Bryan had executed a will that omitted his adoptive grandchildren. The *Bryan* panel found this omission to be insignificant, finding "undisputed evidence that [Bryan] didn't consider [his adoptive grandchildren] to be his heirs." 2011 WL 2535005, at *7. The panel noted that Bryan had also excluded his adoptive grandchildren from a prior will. Thus, the panel found that Bryan's omission did not impair his testamentary capacity. 2011 WL 2535005, at *7.

*Kern* and *Bryan* are instructive for Melitta's omission of Mona Lisa. There was no evidence in this case that Melitta—or the rest of the family—had any contact with Mona Lisa after her adoption. To the contrary, the evidence indicates Melitta did not regard Mona Lisa as an heir. Indeed, Melitta also excluded Mona Lisa from her February 2018 will. Therefore,

13

Melitta's omission of Mona Lisa is not evidence of a lack of testamentary capacity for failing to understand who Melitta's heirs were.

Turning to Melitta's alleged failure to name Fred and Edith and understand their claims at the time of will execution, *Fearn* again provides guidance. There, the evidence showed that Gene told his attorney he wanted to disinherit his children. But O'Rourke presented no evidence that when Gene executed the will, he understood that he had seven children and understood his children's claims when he excluded them from his new will. Therefore, the *Fearn* panel found the evidence insufficient to establish that Gene knew who his heirs were. 2013 WL 6726122, at *6.

Here, the evidence revealed that Melitta was aware of Donna and Brenda near the time she executed the June 2018 will. Additionally, Donna testified that when she lived with Melitta, Gerda would visit to do Melitta's hair. Brenda also testified that after she moved in with Melitta, either Fred or Gerda would be at the house if Brenda was not there. Edith and Fred were both listed in the February 2018 will and the June 2018 will. Carlos did not testify about any discussions he had with Melitta when drafting the June 2018 will. Crail testified that she did not discuss the content of Melitta's will on the day of execution.

Courts have found that a testator knew their natural heirs when there has been evidence of the testator's knowledge of heirs during the will drafting or execution. See *Farr*, 274 Kan. at 66 (finding testamentary capacity where testator recited or acknowledged two sons but did not mention other heirs at law at time of execution); *Kern*, 239 Kan. at 15-16 (finding testamentary capacity where testator knew names of deceased and surviving siblings); *Regle*, 170 Kan. at 560 (finding testamentary capacity where testator referred to devisees' names when will drafted); *In re Estate of Cassell*, No. 124,939, 2023 WL 2195669, at *11 (Kan. App. 2023) (unpublished opinion) (finding testamentary capacity where testator did not identify children at execution meeting but will drafter testified testator knew who children were and reviewed documents with testator on day of execution); *In re Estate of Hubbs*, No. 102,875, 2011 WL 588493, at *5 (Kan.

14

App. 2011) (unpublished opinion) (finding testator knew natural objects of his bounty where testator knew who next of kin were and instructed will drafter on property disposition).

*Brown* again provides some guidance here. There, the will drafter reviewed Brown's will with him but neglected to ask Brown if he knew any relatives other than those listed in the will. The will drafter testified that he still believed Brown knew who his relatives were and what he wanted to do with his property. The Supreme Court noted this testimony and others' testimony that Brown decided how to dispose of his property in reversing the district court's determination that Brown lacked testamentary capacity. 230 Kan. at 731.

In this case, Donna argues that Carlos failed to show Melitta knew who Fred and Edith were despite their inclusion in the June 2018 will. As noted previously, Fred and Edith were also included in Melitta's February 2018 will. Donna testified that Melitta took effort to ensure that all of her children were listed in the February 2018 will. There was also testimony that either Fred or Gerda would be at the house with Melitta when Brenda was not home. Additionally, Carlos testified that during discussions about the plane tickets to Germany, Melitta's "decision was to pay for the plane tickets for her children to go with her." The district court also noted the WellSky report, where Melitta stated she "still knows what's going on, she still knows what she wants, [and] she still is able to make her own decisions." Taken together, this evidence provides substantial competent evidence to conclude that Melitta understood who her natural heirs were.

*Did Melitta know how she was disposing of her property in the June will?*

Donna submits there was no evidence that Melitta knew the disposition she was making. Carlos again responds that the district court drew reasonable inferences from the evidence in finding that Melitta had testamentary capacity.

15

The analysis outlined regarding Melitta's understanding of the nature and extent of her property applies similarly here. In finding that Melitta had testamentary capacity, the district court primarily relied on inferences drawn from Crail's testimony. But as noted above, the district court's inferences were not supported by Crail's testimony.

Cases discussing this issue have often included some evidence of the testator's statements or instructions during the will drafting or execution process. See *Farr*, 274 Kan. at 69 (finding testamentary capacity existed where witnesses testified testator understood what was happening at time of execution and evidence showed intent to disinherit heirs); *Regle*, 170 Kan. at 560 (finding reasonable inference drawn to find testator knew to whom he wished to leave property where testator instructed will drafter on dispositions); *Oliver*, 23 Kan. App. 2d at 517 (finding testator understood disposition of property where will drafter testified testator reviewed will before signing and knew to whom she wanted property to go); *Hubbs*, 2011 WL 588493, at *5 (noting testator directed disposition of property to Shriners' Hospitals).

Here, there was evidence showing Melitta's discontent with Donna near the time that the June 2018 will was executed. The May 2018 police report showed that Melitta wanted Donna out of her house and believed Donna was stealing from her. Brenda testified that it was Melitta's decision not to allow Donna to visit after Donna moved out of the house. Carlos also testified that Melitta made the final decisions in reviewing and paying for the home renovations and plane tickets. Again, the record shows that these decisions and purchases occurred sometime between May 2018 and April 2019.

Additionally, the April 2019 WellSky report showed that Melitta maintained her negative sentiments toward Donna. Indeed, that report showed that Melitta had already stopped giving money to Donna. The district court inferred from the April 2018 transfer on death deed that Melitta executed that deed to leave something to Donna while excluding Donna from the will.

16

Taken together, this evidence supplies substantial competent evidence to conclude that Melitta understood the disposition she was making in her June 2018 will.

We conclude that the district court properly admitted the June will into probate. The court's findings and conclusions are supported by substantial competent evidence. We are not troubled that some of its findings were based on reasonable inferences. We will not substitute our judgment for the district court's judgment.

Affirmed.